**WEIL CERAMICS & GLASS, INC., a New York Corporation, Plaintiff,**

v.

**Bernard DASH and Jalyn Corporation, a New Jersey Corporation, Defendants.**

**Civ. A. No. 84–2157.**

United States District Court,
D. New Jersey.

Aug. 14, 1985.

As Amended Sept. 12, 1985.

Poms, Smith, Lande & Rose by Bernard R. Gans, Los Angeles, Cal. and Kirsten, Friedman & Cherin by Harold Friedman, Newark, N.J., for plaintiff.

Carella, Byrne, Bain & Gilfillan by John N. Bain, Roseland, N.J., for defendant.

## OPINION

DEBEVOISE, District Judge.

### CONTENTS

I.  INTRODUCTION

II.  FACTS

    A.  The Parties
    B.  The Trademark
    C.  Defendants' Action
    D.  The Complaint

III. DISCUSSION

A. Section 33(b). Exclusive Right to Use
B. Section 32(1)(a). Unauthorized Use
   1. Confusion—Genuine Goods
   2. Exhaustion Doctrine—Separate and Independent Good Will
   3. Likelihood of Confusion

C. Unauthorized Importation

IV. CONCLUSION

## I. INTRODUCTION

The instant trademark infringement action concerns the importation and sale of what is commonly referred to as "grey market" goods. Grey market goods are goods produced by a foreign manufacturer bearing the manufacturer's trademark which are legally purchased abroad under a particular trademark and are sold in competition with goods of the United States trademark owner of the same mark. *Vivitar Corp. v. United States,* 761 F.2d 1552, 1555, 225 USPQ 990, 991 (Fed.Cir.1985); *Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416, 418 (S.D. Fla.1983). These goods are also referred to as "parallel imports" where the United States trademark owner is an importer of the goods as well. *Vivitar,* 761 F.2d 1555, 225 USPQ at 991.

Plaintiff Weil Ceramics & Glass, Inc. ("Weil") filed this action against the defendants Bernard Dash and Jalyn Corp. asserting claims under the Lanham Trademark Act of 1946 ("the Act"), as amended, 15 U.S.C. § 1051 *et seq.* The case is now before the Court on cross-motions for summary judgment.

## II. FACTS

### A. The Parties

Weil is a New York corporation in the business of importing and distributing fine giftware. Defendant Jalyn Corp. is a New Jersey corporation which engages in the purchase and sale of giftware and other items. Defendant Dash is the president of Jalyn and provides general managerial duties to the corporation. Dash and his wife are the current stockholders and the sole owners of Jalyn.

### B. The Trademark

In 1963 Weil began importing porcelain and ceramic vases, statuettes and figurines bearing the trademark "Lladro" and a distinctive flower logo placed on the base of the goods. The Lladro trademark was placed on the goods by the manufacturer in Spain, Lladro, S.A., a Spanish corporation. In 1966, Lladro S.A. designated Weil as the exclusive United States distributor of Lladro porcelain, and granted Weil the right to obtain a United States trademark for the Lladro mark in its own name. Exhibit 5 to Weil's reply brief.

On February 8, 1966, Weil filed an application with the United States Patent and Trademark Office ("USPTO") to register the trademark "Lladro" for porcelain and ceramic ware. On September 5, 1967, the USPTO registered the trademark on the Principal Register. Weil subsequently filed an affidavit with the USPTO under Sections 8 and 15 of the Act, 15 U.S.C. §§ 1058 and 1065, asserting that the mark was still in use and had been in continuous use for five consecutive years. This affidavit was accepted and filed by the USPTO on December 21, 1972.

The acceptance and filing of Weil's combined Section 8 and 15 affidavit by the USPTO gave Weil significant rights over the Lladro trademark in the United States. Under Section 8, Weil's registration of the mark remains in full force for 20 years, or until September 5, 1987. 15 U.S.C. § 1058(a). Under Section 15, Weil's right to use the mark became "incontestable." 15 U.S.C. § 1065. When a mark is incontestable, its validity can no longer be challenged in court, except in the situations outlined in the statute. *See* Callman, *Unfair Competition, Trademarks & Monopolies,* § 25.06 (4th Ed.1983 & 1984 Cum. Supp.) (hereafter *"Callman"*).

### C. Defendants' Actions

It is undisputed that since 1982 defendants have distributed and sold porcelain products bearing the Lladro trademark in the United States without Weil's permission or authorization. The parties have

stipulated that the goods which defendants sell are genuine Lladro merchandise and are not a copy or imitation. See Stip. of Facts at 8(b). Defendants acquired these goods from a foreign source on the grey market and imported them for sale in the United States. The goods are apparently obtained through retailers and distributors which are customers of Lladro, S.A. *See* Dash Aff. at ¶ 4.

### D. The Complaint

Weil filed a three count complaint on June 1, 1984. Subject matter jurisdiction is based on 15 U.S.C. § 1121 (granting original jurisdiction for all actions arising under the Act) as well as 28 U.S.C. §§ 1331 and 1338(a). Weil's complaint seeks declaratory and injunctive relief as well as monetary damages. The first count alleges that defendants' acts violated Weil's exclusive right to use the Lladro mark under § 33(b) of the Act, 15 U.S.C. § 1115(b). The second count asserts that defendants' conduct constituted infringement of Weil's trademark in violation of § 32(1)(a) of the Act, 15 U.S.C. § 1114(1)(a). Finally, the third count alleges that defendants violated Weil's exclusive right to import products bearing the Lladro trademark under 15 U.S.C. § 1124 and 19 U.S.C. § 1526. Since the cross-motions are addressed to all three counts, I will discuss each claim *seriatim.*

### III. DISCUSSION

#### A. Section 33(b)—Exclusive Right to Use

■ Section 33(b) of the Act, 15 U.S.C. § 1115(b), provides, in pertinent part:

(b) *If the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the affidavit filed under the provisions of said section 1065 subject to any conditions or limitations stated therein except when one of the following defens-*

es or defects is established: ... (Emphasis added.)

Since defendants have not disputed the incontestability of the Lladro mark, Weil asserts that it may maintain an action under § 33(b). Weil further asserts that an action under § 33(b) does not require a showing of confusion, deception or mistake, as would an action under §§ 32, 42 or 43 of the Act.

I need not decide whether a showing of confusion is required under § 33(b) since I conclude that that section does not create a private cause of action. Obviously, a cause of action is not expressly stated in the statute. Thus, if a cause of action exists under the statute it must be implied.

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), the Supreme Court listed four relevant criteria in determining whether a private right of action should be implied under a federal statute. In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979), the Court noted that the four *Cort* factors were relevant only in determining Congressional intent since implication of a private right of action was a matter for the legislature and not the courts. "[O]ur task is limited solely to determining whether Congress intended to create the private right of action asserted." *Id. See also Transamerica Mortgage Advisors v. Lewis,* 444 U.S. 11, 23–24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979). Since the question is one of statutory construction, *Cannon v. University of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1952, 60 L.Ed.2d 560 (1979), the court should consider the language of the statute, the legislative history and the statutory scheme. *See Touche Ross,* 442 U.S. at 568–71, 99 S.Ct. at 2485–86.

The language of § 33(b) does not establish any intent by Congress to create a cause of action. The statute makes an incontestable mark conclusive *evidence* of an owner's right to use the mark. It merely states the evidentiary status of an incontestable mark. Under § 33(a) a registered mark is *prima facia* evidence of the own-

er's right to use the mark, while under § 33(b) an incontestable mark becomes conclusive evidence. More importantly, the statutory scheme provides persuasive evidence that § 33(b) was not intended to create an implied right of action. Section 32(1)(a) expressly provides that any person who *uses* a copy of a registered mark shall be liable in a civil action. 15 U.S.C. § 1114(1)(a). Thus, § 32 provides an effective remedy for the owner of a mark which has been improperly used by another, whether or not the mark is incontestable. If § 33(b) had been intended to create a private right of action, then there would have been no need for § 32(1)(a). Thus, since § 32 expressly provides a remedy, the statutory scheme effectively negates any Congressional intent to create a cause of action under § 33(b). Finally, if there is anything in the voluminous legislative history of the Lanham Act which establishes that a private right of action was intended under § 33(b), I have not been referred to it. In light of its express language and the statutory scheme, however, any such evidence would not be persuasive.

Therefore, I conclude that Weil's infringement action will rise or fall under § 32. *Cf. U.S. Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 137 n. 3 (3d Cir.1981) (stating that incontestability is relevant in determining "strength" of trademark but analyzing infringement action under § 32). The recent decision of the Supreme Court in *Park'N Fly, Inc. v. Dollar Park and Fly, Inc.,* —— U.S. ——, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985), does not require a different conclusion. In *Park 'N Fly,* the court reversed the Ninth Circuit which had held that § 33(b) could only be used defensively (i.e., a registrant could use the incontestable status of its mark as conclusive evidence only when defending that mark in a cancellation proceeding but not to establish conclusive evidence of incontestability in a trademark infringement action brought by the registrant against another). The Supreme Court held that § 33(b) could be used either offensively (by the registrant in an infringement action) or defensively. The Court did not, however, hold

that § 33(b), in and of itself, provided a private right of action. Since § 33(b) does not create such an implied right of action, the first count of Weil's complaint must be dismissed for failure to state a claim upon which relief can be granted.

## B. Section 32(1)(a)—Unauthorized Use

The second count of Weil's complaint states a claim for trademark infringement under § 32(1)(a), 15 U.S.C. § 1114(1)(a), which reads in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; * * *

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

In order to prevail on its claim under § 32(1)(a), Weil must show that there is no genuine issue of material fact that: 1) it owns the United States trademark for Lladro, 2) defendants used the mark in United States commerce without Weil's consent and 3) defendants' use is likely to cause "confusion." Defendants have conceded the first two points, but vigorously contest the third.

## 1. Confusion—Genuine Goods

Defendants' position is that the importation and sale of *genuine* goods simply cannot cause "confusion." I conclude that it may. However, a brief review of the history of the American law of trademarks and of the Act itself is required in order to explain why.

In *A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), plaintiff had purchased from a French manufacturer the business, goodwill and United States trademarks for face powders produced and sold by the manufacturer. Plaintiff then brought suit to restrain de-

fendant from importing and selling the same goods which defendant had purchased from the manufacturer in France. Defendant sold the goods in the United States in packages closely resembling plaintiff's. The Court began its analysis noting: "There is no question that the defendant infringes plaintiff's rights unless the fact that her boxes and powder are the genuine product of the French concern gives her a right to sell them in the present form." *Id.* at 691, 43 S.Ct. at 245.

The Court held that defendant's conduct constituted infringement. The Court considered it beyond doubt that defendant would have infringed on plaintiff's mark if the goods had been sold with the original label intact. The Court noted that a United States patent would certainly prevent defendant's infringement and found that the "monopoly" of a trademark was no less complete. "It is the trade mark of the plaintiff only in the United States and indicates in law that the goods came from the plaintiff although not made by it. It was sold and could only be sold with the good will of the business that the plaintiff bought. It stakes the reputation of the plaintiff upon the character of the goods." *Id.* at 692, 43 S.Ct. at 245 (citations omitted). Thus, the Court upheld the district court's grant of a preliminary injunction.

*Katzel* has been recognized by courts and commentators as the decision which established the "territoriality principle" of American trademark law. *See Bell & Howell v. Masel Supply Co.,* 548 F.Supp. 1063, 1066 (E.D.N.Y.1982), preliminary injunction vacated, 719 F.2d 42 (2d Cir.1983) (*"Bell & Howell"*) and *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163, 1171 (S.D.N. Y.1984) (*"Osawa"*). According to this principle, the protection which a trademark receives in a particular country depends upon the law of that country. Thus, the effects of registering a trademark in a foreign country do not extend beyond the borders of that country. The "territoriality principle" recognizes that a trademark has a separate legal existence in each country, and that a trademark does not specify the "source of origin" of the product. Rather, it symbolizes the goodwill of the domestic markholder whose reputation backs the particular product in that territory. Thus, even if a trademark correctly identified the manufacturer of the goods, it would still be an infringing product if it deceived the public into believing that the domestic markholder's goodwill stood behind the product.

The contrary view is embodied in the "universality principle" which held that merchandise bearing a lawful foreign trademark could not be deemed an infringing product in another country. This would be true even when a person in the other country had the exclusive right to use the trademark and distribute the product in that country. Since the goods are genuine, the public would not be deceived as to their "source of origin," i.e., the manufacturer.

■ The territoriality principle of American trademark law established in *Katzel*[1] recognized that an importer of goods may own United States trademark rights even though the goods had been manufactured in a foreign country. *See, e.g., Avedis Zildjian Co. v. Fred Gretsch Mfg. Co.,* 251 F.2d 530, 532 (2d Cir.1958). As long as there has been an assignment of the manufacturer's rights in the United States and an agreement that the mark may be registered by the importer, the importer may own the United States trademark rights in the mark. McCarthy, *Trademarks and Unfair Competition,* 2d Ed., 16.16B (1984). *See, e.g.,* Trademark Manual of Examining Procedure at § 1201.04(a) (attached to Weil's Reply Brief at Exhibit 1). After such an assignment, genuine goods imported by the foreign manufacturer and sold in

---

1. The territoriality principle has also been recognized in the Paris Convention for the Protection of Industrial Property ("Paris Convention"). *See generally* Article 6. Since the United States is a signatory to and a member of the Paris Convention, it has the force of law in the United States under Article 6 of the United States Constitution. *Davidoff Extension S.A. v. Davidoff International, Inc.,* 221 U.S.P.Q. 465, 467 (S.D. Fla.1983).

competition with the goods of the United States markholder would infringe since they would cause confusion as to the source of the goods. *Katzel,* 260 U.S. at 692, 43 S.Ct. at 245. Thus, according to *Katzel* genuine goods may cause confusion.

The language and history of § 32 provide additional support for my conclusion. In its original form, it required a showing that the infringing use was "likely to cause confusion, or to cause mistake or to deceive purchasers as to the *source of origin* of such goods or services." (Emphasis supplied). Congress amended § 32 in 1962 deleting the source of origin requirement "thereby evincing a clear purpose to outlaw the use of trademarks which are likely to cause confusion, mistake or deception of any kind, not merely of purchasers nor *simply as to source of origin." Syntex Laboratories, Inc. v. Norwich Pharmacal, Co.,* 437 F.2d 566, 568 (2d Cir.1971) (emphasis added). This amendment made it clear that products causing confusion as to the identity of the company standing behind and insuring the quality of the trademarked goods would also be actionable under § 32. *Bell & Howell,* 548 F.Supp. at 1071. As the district court explained in *Bell & Howell,* "source of origin" did not refer only to the product's manufacturer. The courts (and the Lanham Act) have always recognized that *merchants* as well as manufacturers could be trademark owners. *Id.* at 1069. *See also* 15 U.S.C. § 1127. Even prior to the 1962 amendment, origin merely denoted the "party responsible for exercising judgment respecting the quality of the goods it distributes to the public" and not the manufacturer. 548 F.Supp. at 1070. *See also El Greco Leather Products Co. v. Shoe World, Inc.,* 599 F.Supp. 1380, 1391 (E.D.N.Y.1984). Congress' deletion of the "source of origin" language merely clarified this fact.

While relatively few cases have confronted this issue and the courts have split, I conclude that the better view is that genuine goods may cause confusion. *See Katzel,* 260 U.S. at 692, 43 S.Ct. at 245. *see also Osawa,* 589 F.Supp. at 1170–71 and cases cited therein. *But cf. Bell & Howell,*

719 F.2d at 46 (vacating preliminary injunction concluding that "irreparable injury may well not be present herein since there would appear to be little confusion, if any, as to the origin of the goods and no significant likelihood of damage to [plaintiff's] reputation since thus far it has not been shown that [defendant's] goods, which have a common origin of manufacture with [plaintiff's] goods, are inferior to those sold by [plaintiff] and are injuring [plaintiff's] reputation."); *Monte Carlo Shirt, Inc. v. Daewoo Intern.,* 707 F.2d 1054, 1058 (9th Cir.1982) (holding that under California law confusion was not possible where infringing goods were genuine); *DEP Corp. v. Interstate Cigar Co., Inc.,* 622 F.2d 621, 622 n. 1 (2d Cir.1980) (stating in dicta that it would appear "anomalous" that an infringement action would lie where the product sold is genuine); *El Greco Leather Products,* 599 F.Supp. at 1394 (holding that unauthorized sale of genuine goods could not give rise to likelihood of confusion necessary to maintain federal trademark infringement action). The cases which have concluded that genuine goods cannot cause confusion are in my view incorrect. They implicitly rely on a principle of trademark law which has long since been rejected, *see Katzel, supra,* and are based on a simplistic interpretation of the confusion requirement which cannot be squared with the Act. While the Third Circuit has not addressed the precise issue, I note that *Katzel* has never been overruled and thus remains good law. Therefore, I conclude that defendants' importation and sale of Lladro products may cause confusion under § 32.

*2. Exhaustion Doctrine—Separate and Independent Good Will*

The following facts are not disputed. Until his death in the mid 1960's, Max Weil was the sole owner of Weil Ceramics. After Weil's death, the corporation was owned by three individuals, including Stanley Nagler. In 1973, 50 percent of Weil's stock was acquired by Lladro S.A. with Nagler retaining the remaining 50 percent. Weil then assigned all United States rights

in the Lladro mark to Lladro S.A. In 1977, Lladro Exportadora S.A., a sister corporation of Lladro S.A. also owned by Sodigei, S.A., acquired all outstanding shares of Weil from both Lladro S.A. and Nagler. In 1983, Lladro S.A. then assigned all United States rights in the Lladro mark back to Weil. *See* Weil Reply Brief at Exhibit 7.

Defendants argue that even if genuine products may cause confusion there is no confusion in the present case because Weil has failed to develop a separate and independent goodwill for Lladro products in the United States. Pointing to the fact that Lladro S.A. and Weil share the same corporate parent, Sodigei, S.A. of Spain, defendants argue that Weil is merely a conduit in an international distribution chain for Lladro products. "Since Weil and Lladro S.A. are one and the same for all practical purposes, once the goods have been released into commerce anywhere in the world, Weil has constructively enjoyed the benefit of its ownership of the mark Lladro." Defendants' Opposition Brief at 10–11. Defendants do not argue that the common corporate ownership of Weil and Lladro S.A. in and of itself precludes Weil from bringing a trademark infringement action. Rather, they simply contend that in the present case there is no likelihood of confusion since the goodwill behind the Lladro trademark in the United States is identical to the goodwill behind the Lladro mark in Spain.

Defendants argue that the "exhaustion doctrine" of trademark law demands that Weil establish a separate and independent goodwill for Lladro products in the United States.

> Under this doctrine, as applied within the borders of a sovereignty, a markholder may no longer control branded goods after releasing them into the stream of commerce. After the first sale, the brandholder's control is deemed exhausted. Down-the-line retailers are free to display and advertise the branded goods. Secondhand dealers may advertise the branded merchandise for resale in competition with the sales of the markholder (as long as they do not represent themselves as authorized agents).

*Osawa*, 589 F.Supp. at 1173–74.

When applied to international trade, the exhaustion doctrine "seemed to suggest that once the original mark owner had lost control of the marked goods by releasing them into commerce, his assignee in a foreign country could not logically own rights superior to those of the assignor. The right of control seemed exhausted." *Id.* at 1174. Thus, defendants contend that Lladro S.A. exhausted its rights in the mark when it released its goods into the stream of commerce. Since Weil, Lladro S.A.'s assignee, cannot have superior rights to its assignor, defendants conclude that Weil's rights have been exhausted as well.

Relatively few cases have considered the applicability of the exhaustion doctrine when the United States markholder is related to the foreign markholder. In *Bell & Howell, supra,* plaintiff held the United States trademark rights and was the exclusive importer of certain Mamiya photographic equipment. Ninety-three percent of plaintiff's stock was owned by Osawa-USA, which was in turn wholly owned by Osawa-Japan, the exclusive worldwide distributor of Mamiya equipment. The remaining 7% of plaintiff's stock was owned by Mamiya Co., the manufacturer of these goods and the owner of the identical mark in Japan. Thirty percent of Mamiya's stock was owned by Osawa-Japan. Defendant imported and sold in the United States without plaintiff's authorization genuine Mamiya products which defendant had purchased on the grey market. Plaintiff moved for a preliminary injunction.

Defendant argued that there could be no likelihood of confusion between goods imported by them and goods sold by plaintiff. Defendant distinguished *Katzel* on the ground that plaintiff in that case was not related to the foreign manufacturer and originator of the trademark. Defendant argued that where the American mark owner was subject to common ownership and control with the owner of the mark in foreign nations, or formed part of a unified

international enterprise, there could be no likelihood of confusion. Defendant presented evidence that: 1) plaintiff's board was comprised of three directors of Osawa-Japan and one of Mamiya Co., 2) plaintiff received financial support from Osawa-Japan, 3) plaintiff sent financial reports to Osawa-Japan, and 4) Osawa-USA, Osawa-Japan's wholly-owned subsidiary, and plaintiff filed consolidated tax returns.

Plaintiff opposed defendant's attempt to pierce the corporate veil and lump it, Osawa-Japan and Mamiya Co. into a single international enterprise. Plaintiff asserted that the business of importing the Mamiya equipment into the United States belonged to plaintiff and not Osawa-Japan, notwithstanding the close corporate ties of the companies. Plaintiff presented evidence: 1) that it determined the terms and conditions of the warranty on the equipment, 2) that it included an English language instruction booklet with the equipment, 3) that plaintiff was the warrantor of the product, and 4) that plaintiff had expended substantive sums advertising in the United States and establishing a nationwide dealer network.

After reviewing the concept of goodwill and the territoriality principle, *id.* at 1069–70, the court considered the related customs and trademark laws, 15 U.S.C. § 1124 and 19 U.S.C. § 1526 (discussed *infra* at Section III C), which are directed against the importation of foreign-made goods bearing United States trademarks. After thoroughly analyzing the issues, the court concluded that there was a substantial likelihood of confusion.

The business of selling MAMIYA goods in the United States is the plaintiff's business. It is the legitimate owner of the MAMIYA marks. Its ownership of those marks, conversely, "indicates in law," *Bourjois v. Katzel, supra,* 260 U.S. at 692, 43 S.Ct. at 245, that the goods came from plaintiff. It is plaintiff that defines the warranty and provides the repair services for the cameras it sells. The cameras defendant sells lack that warranty. No proof supports de-

fendant's contention that the public associates the MAMIYA marks with the Japanese manufacturer, even assuming that such proof could alter the legal consequence of the assignment of the marks to plaintiff. For it must be recognized that plaintiff is not a mere shell but the legitimate and actual owner of the business of selling MAMIYA medium format products in the country.

*Id.* at 1079.

Turning to defendant's argument that there could be no confusion when plaintiff formed part of an international organization distributing the same product, the court found that plaintiff's business in the United States was different from that of both Osawa-Japan and Mamiya Co. "It is plaintiff's warranty and assurances of quality that are signified by the Mamiya marks in this country. Defendant's use of those marks carries with it none of these assurances." Thus, the court found a substantial likelihood of confusion and granted a preliminary injunction restraining defendant's sale of Mamiya products.

The Second Circuit vacated the preliminary injunction, finding insufficient factual support for the district court's finding of a likelihood of confusion. 719 F.2d 42, 45–46 (1983). In doing so, the court expressed skepticism that genuine goods could ever cause confusion as to the source of the goods. *Id.* at 46. As I have previously noted, however, I do not share the Second Circuit's skepticism that genuine products cannot cause confusion. *See supra,* at 704–706. I believe that they may. Therefore, the Second Circuit's opinion in *Bell & Howell* is not persuasive on the issue of separate and independent goodwill. Its holding is limited to the issue of irreparable injury which the district court did not discuss in granting the injunction. 719 F.2d at 46.

The second case which discussed the concept of a separate and independent goodwill was *Osawa.* The plaintiff in *Osawa* was the same as the plaintiff in *Bell & Howell.* Only the corporate name had changed. In *Osawa,* the United States

Customs Service granted plaintiff an order of exclusion barring the unauthorized importation of goods bearing the Mamiya mark. Defendants allegedly imported certain equipment in violation of the Customs order of exclusion. Plaintiff moved for a preliminary injunction. The preliminary injunction hearing took place after the Second Circuit's decision in *Bell & Howell* and plaintiff offered "substantial proofs" of irreparable harm. 589 F.Supp. at 1165. Judge Leval granted plaintiff's motion specifically under the customs laws, 19 U.S.C. § 1526, but also noted that an injunction would be warranted under the trademark laws as well. *Id.*

Although Osawa-Japan owned a controlling interest of plaintiff's stock, the court found that plaintiff functioned as a separate legal entity. The court also found that plaintiff through advertising and promotion had successfully developed goodwill in the Mamiya marks. *Id.* at 1165. Plaintiff maintained a stock of peripheral equipment designed to meet the needs of its customers. It purchased advertising, organized seminars and offered rebates on Mamiya products. Plaintiff distributed its equipment only through authorized dealers who demonstrated a willingness to carry a full line of stock to service customers' needs. Plaintiff devoted care to handling and inspecting Mamiya products, and offered free warranty repair. The court also noted that plaintiff provided warranty services for grey market goods as well as for its own authorized merchandise in order to promote the continued goodwill of the Mamiya mark.

After determining that irreparable injury would occur without an injunction and that the balance of hardships weighed in plaintiff's favor, the court turned to plaintiff's likelihood of success on the merits. Although much of the court's analysis focused on the customs laws (*see infra* Section III C), the court discussed the "exhaustion" doctrine of trademark law. Defendants argued that plaintiff could no longer exert control over the Mamiya mark once the goods were sold in international commerce bringing a profit to the original markholder in Japan. Judge Leval recognized that in spite of the territoriality principle there might "arguably" be no infringement where the assignee of the mark in the foreign country had not developed a "separate, factually independent goodwill." *Id.* at 1174. "If the United States mark represents nothing more than a foreign outpost of the goodwill associated with the original mark, it might well be argued that exhaustion has taken place with the release into commerce and that no infringement occurs on unauthorized importation." *Id. citing* Derenberg, *Territorial Scope and Situs of Trademarks and Good Will,* 47 Va.L.Rev. 753 (1961). The court rejected, however, defendants' exhaustion argument finding that plaintiff had developed a substantive goodwill separate and distinct from the goodwill emanating from the branded products themselves.

> This local goodwill is the product of plaintiff's many U.S. activities (described above) promoting and standing behind the mark, including significantly warranty services, promotional rebates, educational activities and advertising. The Mamiya trademark in the U.S represents a goodwill generated and importantly influenced by these activities. It is not the same trademark either in law or in fact as the Mamiya trademark at the place of manufacture, where it designates only the goodwill of the manufacturer.

After reviewing the pertinent customs statutes and regulations, Judge Leval concluded that plaintiff was entitled to preliminary relief under the customs statute and for trademark infringement as well. *Id.* at 1179.

Although it was not expressly mentioned, the exhaustion doctrine was applied to a grey market case in *Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416 (S.D.Fla.1983). In *Parfums,* plaintiff was the owner of the United States trademark for Oscar de la Renta fragrances. The court found that plaintiff was a cog in "what appear[ed] to be a single international enterprise operating through an amoeba-like structure" to dis-

tribute the product worldwide. Some of the enterprise's foreign distributors apparently sold products to other entities for import into the United States. Customs seized the products. Plaintiff then brought suit against the consignees of these shipments under both the trademark laws and the Tariff Act, 19 U.S.C. § 1526.

The Court found that plaintiff and its related companies had spent considerable sums advertising and promoting the product. "The plaintiff stands behind its product and has developed goodwill in conducting its business." *Id.* at 419. The court concluded, however, that plaintiff's rights in the Oscar de la Renta trademark had been exhausted once the product was placed into the international stream of commerce by its affiliates. The court found that plaintiff was seeking protection under the trademark laws for actions which plaintiff had set in motion through its own foreign manufacturing and distribution sources. Since "plaintiff's international enterprise" was originally compensated for the goods when they were purchased on the parallel market, the court found that the Lanham Act did not protect plaintiff. The court recognized that *Katzel* was the law of the land, but distinguished that case on its facts. Similarly, the court found that *Bell & Howell* was an admirable statement of the law but noted that that case did not involve a "single, international enterprise." The court noted that in *Bell & Howell*, there was no evidence that the related companies exerted control over plaintiff's policies or operations while in *Parfums* the record was replete with evidence of the interrelation between plaintiff and the other entities comprising the international enterprise. The court therefore found that plaintiff had not established a likelihood of success on the merits and denied the motion for a preliminary injunction. (The court also found that plaintiff had failed to establish any of the other elements for a preliminary injunction).

■ Based upon my reading of these three cases, I conclude that the exhaustion doctrine applies when the United States

markholder is related to the foreign markholder and/or manufacturer. However, I also conclude that the exhaustion doctrine does not apply when the United States markholder has developed a "separate, factually distinct goodwill" in its product. *Osawa, supra.* It is not anomalous that a mark on an identical product may represent a separate and independent goodwill in different countries. This does not mean the goodwill in one country is any better or worse than it is in the other, but rather that it is different. The difference in the goodwill is determined by ascertaining the person who stands behind the product and insures its quality in the United States. If it is the foreign manufacturer, then there is no distinct goodwill. If, however, it is the United States markholder, then there is a distinct goodwill. Thus, for example, in *Osawa* the court found that the United States markholder had developed a distinct "local" goodwill in the mark notwithstanding the fact that the exclusive worldwide distributor owned 93% of plaintiff's stock and the foreign markholder 7%. "This local goodwill is the product of plaintiff's many activities ... promoting and standing behind the mark, including significantly warranty service, rebates, educational activities and advertising." 589 F.Supp. at 1179. *See also Bell & Howell,* 548 F.Supp. at 1079 (where the court noted that foreign markholder only owned 7% of plaintiff's stock and that there was no evidence that it exerted any control over plaintiff's policies and operation. *Id. N.* b. The distributor which owned 93% of plaintiff's stock also owned 30% of the foreign markholder's stock and no other shareholder owned more than 6%. *Id.* at 1067). The *Parfums* case presents a situation where the goodwill in the United States mark was the same as that in other countries. Although the court did not expressly discuss the issue in terms of exhaustion (probably because the case was decided without the benefit of Judge Leval's thoughtful discussion of the issues in *Osawa* ), the court obviously concluded that plaintiff's rights had been exhausted once the product was placed into the international stream of commerce by its

affiliated companies. Although the court at one point stated that *plaintiff* stood behind the product and had developed its goodwill, *id.* at 419, the court obviously found no separate and independent goodwill in the United States since it repeatedly emphasized that plaintiff was merely a cog in a single international enterprise.

Therefore, I conclude that Weil must demonstrate a separate, factually distinct goodwill in order to maintain an action for infringement against defendants. *Cf. Katzel, supra* (where district court emphasized development of distinct United States goodwill by United States markholder in granting preliminary injunction, 274 F. 856, 857 (S.D.N.Y.1920), and where Supreme Court relied upon this fact in affirming. 260 U.S. at 692, 43 S.Ct. at 245.). As noted above, defendants do not argue that the fact that Weil and Lladro S.A. share a common corporate parent will preclude Weil from ever establishing any separate and independent goodwill in the Lladro mark, and I am unable to find any good reason why it should. *Cf.* 15 U.S.C. § 1127 defining "related company" as any person who controls or is controlled by the registrant "in respect to the nature and quality of the goods or services in connection with which the mark is used." I do not believe that the percentage of ownership should determine whether a separate goodwill has been developed. (To the extent that *Parfums* may be read to require such a simplistic analysis, I would disagree). The question is a factual one. Is the product's goodwill in the United States promoted and developed separately by the United States markholder or does the mark merely represent a foreign outpost of the goodwill associated with the original mark? *See Osawa,* 589 F.Supp. at 1174. The relationship of different markholders does not, in and of itself, preclude them from developing independent goodwills in the same mark. What must be determined is whether the United States markholder has developed the goodwill of the product in the United States or whether it has merely relied upon the mark's international goodwill.

█ It is an elementary principle of trademark law (and a necessary corollary to the territoriality principle) that a mark in one country symbolizes the domestic goodwill of the entity which stands behind the product in that country. *Osawa,* 589 F.Supp. at 1172; *Bell & Howell,* 548 F.Supp. at 1069. If the mark does not symbolize a separate and independent goodwill in the United States, there can be no confusion between the products imported by the United States markholder and those imported on the grey market. Their source is the same. Since there would be no confusion between the two, no action for infringement would lie. The foregoing explains, for the most part, the apparent conflicts in the cases which have discussed the issue. When the courts have held that genuine goods do not infringe, they implicitly have found no distinct United States goodwill and hence no confusion. *See e.g., Parfums,* 575 F.Supp. at 418–20 and *El Greco,* 599 F.Supp. at 1398. *See also Coalition to Preserve Integrity v. United States,* 598 F.Supp. 844 (D.D.C.1984).

█ Notwithstanding its argument that no such showing is required, Weil asserts that it has established a separate and independent goodwill for the Lladro mark in the United States. According to the deposition testimony of Charles Morgan, the Executive Vice-President of Weil, Lladro porcelain was virtually unknown in the United States when Weil began importing it in 1963. Morgan Dep. at 105. According to Morgan, Weil's name and efforts in promoting Lladro in the United States were important factors in the development of a United States market. *Id.* (Weil was the owner of the United States trademark from 1967 until 1973 before it was assigned to Lladro S.A. after it had acquired 50% of Weil's stock).

Weil selects the retail stores which it concludes are appropriate to carry Lladro merchandise. *Id.* at 43–44. Weil employees visually inspect all limited edition pieces and most of the larger pieces it receives. Morgan Dep. at 36–40. The remaining smaller pieces receive a shake test

to determine breakage. *Id.* Weil also stands behind the porcelain which it sells by exchanging any piece having any imperfection. *Id.* at 49. See also Morgan Aff. at ¶ 13. Since Weil is a wholesale distributor, it rarely deals with consumers. If a consumer has a problem with merchandise, the product is normally returned to the retailer who sold the product. The defective piece is then shipped to Weil by the dealer, and Weil credits the dealer's account. Morgan Dep. at 51–52. In one instance, a consumer sent the piece directly to Weil after the dealer had replaced the defective piece. *Id.* at 52.

Weil devotes approximately 10% of its budget to advertising Lladro products. Morgan Aff. at ¶ 11. Weil's advertisements in national magazines always contain Weil's name. Morgan Dep. at 74. Furthermore, in one advertisement consumers were encouraged to write directly to Weil "exclusive importers" for Lladro, in order to obtain a flower brochure. *Id.* at 75; *see* Reply Brief at Exhibit 10. Weil maintains permanent showrooms for Lladro products, and also attends trade and gift shows to promote Lladro merchandise. Morgan Aff. at ¶ 14; *see also* Morgan Dep. at 53–54 and 70–73. Lladro catalogs, plaques, leaflets and posters are provided by Weil. *Id.* at 44. Additionally, Weil imports another line of crystal from France which it sells under the United States trademark of Lladro. Morgan Dep. at 23–25. Weil has also established the Lladro Collectors Society which is designed to provide consumers with services and information about Lladro products. *Id.* at 13–18. [This deleted paragraph is contained in the opinion of the court filed under seal.]

Defendant argues that notwithstanding Weil's evidence of a separate and independent goodwill Weil is not recognized by the consuming public as the exclusive distributor or "source" of the Lladro merchandise. Defendants argue that since Weil's only contact with the ultimate consumer occurs when it sells "seconds" during warehouse sales the ultimate purchaser would not be likely to look to Weil as the party respon-

sible for the quality of merchandise manufactured by Lladro S.A. This facile argument is specious. "It is of little significance to the establishment of trademark rights whether the public can identify correctly by name the owner of the mark.... What is significant is whether the public misperceives the existence of single commercial entity as the sponsor of the mark, not whether the public can accurately name that entity." *Osawa,* 589 F.Supp. at 1174 citing *Coty, Inc. v. Le Blume Import Co., Inc.* 292 F. 264, 267 (S.D.N.Y.), *aff'd,* 293 F. 344 (2d Cir.1923). The "source" of the goods in trademark law refers to the person who insures the quality of the goods, and a trademark is only required to identify a single, albeit anonymous source

As Judge Jerome Frank succinctly states, "It matters not whether the customers know just who is the source". Thus, the "source" identified by the trademark need not be known by name to the buyer. It may be anonymous in the sense that the buyer does not know, or care about, the name of the corporation that made the product or the name of the corporation which distributes it. But the buyer is entitled to assume that all products carrying the same trademark are somehow linked with or sponsored by that single, anonymous source. Once the courts recognized that a trademark need not denote a precise source of origin, but rather an "anonymous" source, they were recognizing that consumer differentiation by means of trademarks was not a precise process.

McCarthy, *Trademarks and Unfair Competition,* § 3.3(B) (2nd 1984).

Defendants also dispute Weil's separate and independent goodwill in the Lladro mark. Defendants note that 95% of the Lladro items are merely subjected to a shake test and only 4 to 5 percent are visually inspected. Morgan Dep. at 36–40. Weil's name only appears on the packaging of Lladro products which have been visually inspected. *Id.* at 39–42. Furthermore, no material is introduced into the Lladro boxes which bears Weil's name. *Id.* at 36.

Defendants also note that Weil is never mentioned in any television or radio advertising conducted by retailers of Lladro products. *Id.* at 79. Defendants also assert that Weil has not engaged in any promotional or educational activities associating Weil with Lladro products.

In order to prevail on a motion for summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A motion for summary judgment may only be granted if there are no remaining issues of material fact which, if believed by the trier of fact, would justify a finding for the party opposing that judgment. *Bryson v. Brand Insulation, Inc.*, 621 F.2d 556, 559 (3d Cir.1980). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord*, 624 F.2d 1169, 1181 (3d Cir.1980). However, the opposing party may not rest upon the mere allegations or denials of his pleadings, but his response must set forth specific facts showing a genuine issue for trial. *DeLong Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1139 (3d Cir.1980).

I conclude that defendants' evidence fails to establish a genuine issue of fact as to the existence of a separate and independent goodwill. The fact that Weil only performs a shake test on certain products is insignificant. It is undisputed that Weil insures the quality of the goods and replaces all defective pieces. Similarly, I do not believe that the fact that Weil's name rarely appears on the packages which consumers receive has any bearing in determining whether there is a separate and independent goodwill. The retailers with whom Weil deals directly are aware that Weil backs the goods. As noted above, consumers may assume that the trademarked goods are sponsored by a source even if that source is anonymous. Furthermore, Weil places advertisements in national magazines which do disclose that Weil is the exclusive importer of Lladro products. Since what they are selling is the product, and they do not deal directly with consumers, there is no need for Weil to display its name prominently in these advertisements. Thus, the fact that Weil is not mentioned in advertising by retailers is also of no moment. Finally, defendants' assertions that Weil does not engage in any promotional or educational activities are contradicted by the record. Weil has established the Lladro Collectors Society which provides service and information to consumers. It maintains permanent showrooms and also participates in trade shows. (Although Weil held major promotions for Lladro products in 1982, see Morgan Dep. at 71–73, I will not consider this fact in considering the existence of a separate and independent goodwill since Weil did not own the United States trademark for Lladro porcelain at that time). Therefore, I conclude that there is no genuine issue of material fact that Weil has established a separate and independent goodwill in the United States for the Lladro mark.

*3. Likelihood of Confusion*

■ To prevail on its trademark infringement claim, Weil must also show that there is no genuine issue of material fact that there is a likelihood of confusion. Of course, likelihood of confusion is normally a question of fact. In the present case, however, it has been stipulated that the goods which defendants import are genuine or identical. As I noted above, there is no genuine dispute that the goodwill representing Weil's mark is distinct from any other Lladro mark in international commerce. Therefore, there can be no dispute that defendants' identical products cause confusion as to the entity which stands behind the product. *Cf. Model Rectifier Corp. v. Takachiho International Inc.*, 709 F.2d 1517, 221 U.S.P.O. 502, 503 (9th Cir.1983). Consumers in the United States have the right to believe that Weil, and only Weil, is the person who insures the quality of Lladro porcelain. When defendants sell Lladro porcelain, however, Weil does not guarantee the quality of those goods.

[This deleted portion of the paragraph and an accompanying footnote are contained in the opinion of the court filed under seal.]

Defendants argue that Weil's warranty to replace defective pieces is similar to defendants' obligations under the Uniform Commercial Code, N.J.S.A. 12A:1–101 *et seq.* This does not, however, alleviate the likelihood of confusion. In fact, it compounds it. "For the warranty is of value to the goodwill of the mark only if offered by one who has the incentive to uphold the reputation of the mark." *Osawa,* 589 F.Supp. at 1169. Defendants do not have the same incentive to uphold the reputation of Lladro porcelain as does Weil. Weil would constantly be subject to the risk that defendants would disavow their obligation or perform inadequate repairs. The disparity between warranty service would cause further confusion to consumers who look to Weil as the entity which insures the quality of Lladro porcelain. *Id.*

Thus, I conclude that there is no genuine issue of fact that Weil owns the United States trademark for Lladro porcelain, that defendants have used the mark in commerce without Weil's consent and that such use is likely to cause confusion. Therefore, I will grant summary judgment in favor of Weil on the second count of its complaint.

### C. *Unauthorized Importation*

The third count of Weil's complaint asserts a cause of action under § 42 of the Lanham Act, 15 U.S.C. § 1124, and § 526 of the Tariff Act of 1930, 19 U.S.C. § 1526. Section 42 provides in pertinent part:

> Except as provided in subsection (d) of section 526 of the Tariff Act of 1930, no article of imported merchandise ... which shall copy or simulate a trademark registered in accordance with the provisions of this Act ... shall be admitted to entry at any customhouse in the United States.

Similarly, § 526(a) of the Tariff Act makes importation of such goods without the owner's consent unlawful:

> (a) Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of section 81 to 109 of Title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said Title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

Section 526(d) provides an exception when the articles are for personal use of certain merchandise as long as the merchandise is of the type and quantity specified by the Secretary and is not intended for resale. It is undisputed that this section does not apply in the instant case.

The question in the present case is whether the third count requires a different analysis from that of the second count, specifically as to whether genuine goods may cause confusion which would require exclusion of the goods. The parties have apparently assumed that the same analysis is warranted for each count since they have, for the most part, discussed the issues without differentiating between each cause of action. (For purposes of clarity, I have discussed the issues separately). Logic would seem to indicate that if the use of products bearing the Lladro mark is prohibited, then importation of such goods should also be prohibited. A brief review of the history and purpose of the import statutes establishes that this is true.

A number of courts have exhaustively analyzed the unique history of § 526. *See Vivitar Corp. v. United States,* 761 F.2d 1552, 225 U.S.P.Q. 990, 996–1000 (Fed.Cir. 1985); *Osawa,* 589 F.Supp. at 1175–78; *Coalition to Preserve Integrity v. United States,* 598 F.Supp. 844, 849–50 (D.D.C. 1984) ("COPIAT"); *Bell & Howell,* 548 F.Supp. at 1072–78. Therefore, I will offer

only a brief summary of that issue so as to explain the basis for my conclusion that genuine goods may cause confusion under § 526.

Section 526 was enacted shortly after the Second Circuit held in *Katzel* that genuine goods could not cause confusion under the trademark laws. That holding basically re-affirmed the principle which had first been established by the Second Circuit in *Fred Gretsch Mfg. Co. v. Schoening*, 238 F. 780 (2d Cir.1916). In *Gretsch,* the Second Circuit held that § 27 of the Trademark Act of 1905 (the predecessor to § 42 of the Lanham Act) which prohibited the importation of goods which copied or simulated a registered mark did not bar the importation of genuine goods. Mainly in response to the Second Circuit's holding in *Katzel,* Congress enacted § 526. As the court explained in *Vivitar,* § 526 did not effect a change in the trademark laws but rather in the customs laws. 761 F.2d at 1561, 225 U.S.P.Q. at 998. Thus, § 526 was intended to supply the supposed "casus omissus" of § 27 of the Trademark Act of 1905. *Coty, Inc. v. LeBlume Import Co., Inc.,* 292 F. 264, 268–69 (S.D.N.Y.), *aff'd,* 293 F. 344 (2d Cir.1923).

Shortly after the enactment of § 526, the Supreme Court reversed the Second Circuit's decision in *Katzel* and held that genuine goods could cause infringement. Later that term, the Supreme Court held that genuine goods were excludable under § 27 in *A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923). Relying upon *Katzel,* the Court in a memorandum opinion held that the sale of genuine goods constituted trademark infringement and that § 27 required exclusion of such goods from entry into the United States. The Court did not refer to the recently enacted § 526. *See also Sturges v. Clark D. Pease, Inc.,* 48 F.2d 1035 (2d Cir.1931) (holding that importation of genuine merchandise for personal use was excludable under the statute. N.b. According to current regulations under § 526(d) certain merchandise for personal use may be permitted. *See supra* at 33).

The decision of the Supreme Court in *Aldridge* made it clear that genuine goods may infringe under the trademark laws and further that such infringing goods would be excludable under both the trademark and customs laws. The enactment of § 526 merely reinforced that conclusion. Therefore, I find that genuine goods may cause confusion under both § 526 and § 42. *Cf.* 48 U.S.C. § 1643 which provides that § 42 and § 526 are not applicable to importations into the Virgin Islands of "genuine foreign merchandise bearing a genuine foreign trademark" but are applicable to imports from the Virgin Islands to the United States. If Congress did not believe that genuine goods were excludable under § 42 and § 526, then it would not have had to create a special exception for imports into the Virgin Islands.

Defendants have moved to dismiss the third count of Weil's complaint, or in the alternative, for summary judgment. Defendants rely primarily on *Parfums Stern* and *COPIAT* in support of their argument. As noted previously, *Parfums Stern* involved a single international enterprise. In the present case, I have already concluded that Weil has established a separate and independent goodwill for the Lladro mark. Therefore, *Parfums Stern* is inapposite.

*COPIAT* is similar to *Parfums Stern.* It involved a group of trademark owners who had licensed their foreign subsidiaries to manufacture goods bearing their trademarks. Plaintiffs brought suit to prevent importation of grey market goods under § 42 of the Lanham Act and § 526 of the Tariff Act. Defendants moved to dismiss the infringement claim arguing that § 42 did not prevent importation of genuine goods. The court noted that the case was distinguishable from *Katzel* and *Aldridge* because in those cases the United States markholder was truly independent of the entity applying the mark abroad, and had developed "its own goodwill in the American marketplace." *Id.* at 848. The court found in the case before it that the United States markholders did not come within *Katzel* and *Aldridge* and dismissed the ac-

tion under § 42. *Id.* To the extent that *COPIAT* infers that a truly independent United States markholder may maintain an action for infringement under § 42 to prevent importation of genuine goods, I am in total agreement. However, if by "independent" the court simply meant unrelated, I disagree. As I have already noted, whether the domestic markholder is independent does not depend on its relation to a foreign entity, but rather upon whether there is a distinct goodwill for the product in the United States. That is precisely what the *COPIAT* court concluded. Thus, I find nothing in *COPIAT* which convinces me that Weil's third count must be dismissed.

■ I note that Weil has not moved for summary judgment on the third count. However, on defendants' motion I am already engaged in the process of determining whether there is a genuine issue of material fact, and the parties have had the opportunity to present evidence on the issues. The weight of authority establishes that summary judgment may be rendered in favor of the opposing party even though no formal application has been made. 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 2720 pp. 29–30 & n. 20 (1983); *see, e.g., People's Trust Co. of Bergen County v. United States,* 311 F.Supp. 1197 (D.N.J.1970), *aff'd,* 444 F.2d 193 (3d Cir.1971).

I have already concluded that the exhaustion doctrine of trademark law applies to grey market cases and that a separate and independent goodwill must be shown by the domestic markholder. *See supra* at 22–25. Of course, I have already found that Weil has established a separate and independent goodwill for the Lladro mark and that defendants have failed to show any genuine issue of material fact. However, since Customs has adopted regulations which specifically deal with ownership and control of related companies, it is arguable that my finding of separate and independent goodwill has no bearing on the issues presented under § 526.

Pursuant to statute, United States Customs has enacted regulations dealing with the import restrictions imposed by § 42 of the Lanham Act and § 526 of the Tariff Act. *See* 19 C.F.R. § 133.0 *et seq.* Under the current regulations, trademarks may be recorded by filing an application with Customs. *Id.* at § 133.2. Merchandise copying or simulating a recorded trademark will be denied entry and is subject to forfeiture. *Id.* at § 133.21(a). A "copying or simulating" mark is defined as an actual counterfeit of the recorded mark or one which so closely resembles it as to be likely to cause the public to associate the copying mark with the recorded mark. *Id.* Under subsection (b), foreign articles bearing a mark identical to a recorded mark are also prohibited.

Section 133.21(c)(2) provides that the restrictions set forth in paragraph (a) and (b) do not apply if:

> (2) the foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control (see § 133.2(d) and 133.12(d) )

Sections 133.2(d) and 133.12(d) provide that "common ownership" means individual or aggregate ownership of more than 50 percent of the business and that "common control" means effective control in policy or operations and is not necessarily synonomous with common ownership. *Id.* at § 133.2(d)(1) and (2).

The genesis of the current regulations may be traced back to *United States v. Guerlain,* 155 F.Supp. 77 (S.D.N.Y.1957), *vacated and remanded,* 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *action dismissed,* 172 F.Supp. 107 (S.D.N.Y.1959). In *Guerlain,* the Justice Department instituted an antitrust action against the United States distributors of French perfumes who had obtained exclusion of genuine goods under § 526. The district court found that the distributors were part of a single international enterprise and that the exclusion order violated § 2 of the Sherman Act. On appeal to the Supreme Court, the Justice Department reversed its position, apparently believing that such a change in the law should come from legis-

lation rather than adjudication. The Supreme Court vacated the district court order and the case was subsequently dismissed with prejudice. Legislation was prepared but never enacted. *See Osawa,* 589 F.Supp. at 1176.

In response to the position taken by the Justice Department in *Guerlain,* Customs adopted regulations which substantially narrowed the rights conferred upon a registrant under § 526. These regulations denied exclusion if the foreign and United States trademarks were owned by related companies. 19 C.F.R. § 11.14(b) (1954). Customs later dropped this limitation after *Guerlain* was dismissed, but in 1973 promulgated similar regulations which are now codified as the current regulations, 19 C.F.R. § 133.0 *et seq.*

█ Although Weil and Lladro S.A. are not in a parent-subsidiary relationship, they are admittedly subject to common ownership. Thus, genuine Lladro goods would not be subject to exclusion under the current regulations, regardless of whether Weil had developed a separate and independent goodwill. The question thus becomes whether the Customs regulations preclude Weil from obtaining relief under § 42 of the Lanham Act and § 526 of the Tariff Act. I conclude that they do not.

The customs regulations do not define the statutory *limits* of § 526 or of § 42. *See Vivitar Corp. v. U.S., supra.* In *Vivitar,* plaintiff brought suit to invalidate these regulations on the ground that they improperly allowed importation of grey market goods contrary to the express provisions of § 526 of the Tariff Act. The court exhaustively reviewed the legislative history of § 526 and recounted the various interpretations which Customs had given to it over the years. The court held that the regulations "do no more than define Customs' role in initiating administrative enforcement of the statute." *Id.* 761 F.2d at 1569, 225 U.S.P.Q. at 1003. The court of appeals concluded that it was for the courts to independently determine in a private suit under § 526 whether importation of particular grey market goods should be prohibit-

ed. Thus, Customs' determinations had no effect whatsoever on a trademark owner's right to seek a judicial determination of infringement under § 42 of the Act and to have the goods excluded under § 526.

In connection with the exclusion under the trademark statute (15 U.S.C. § 1124), Customs' administrative determination that importation bear a mark that is not likely to cause confusion with a recorded mark has no effect on a trademark owner's right to obtain a judicial determination of infringement and thereafter to have such goods excluded (or vice versa). Similarly, Customs' decision, as expressed in the subject regulations, not to exclude grey market goods does not control on the question of whether particular goods should or should not be excluded. A trademark owner is entitled as in the "confusingly similar" mark case, to pursue private remedies against the importer and, if successful, to have such grey market goods excluded.

*Id.* (citations omitted).

The fact that the regulations did not go as far as they might have in automatically excluding grey market goods, did not mean that they were contrary to the statute or invalid.

That Customs regulations do not provide for exclusion initially in a case where the trademark owner ultimately prevails in federal district court does not mean that regulations must be declared invalid. Where protection under the statute is unclear or depends upon resolution of complex factual situations, Customs may decline to impose sua sponte the extreme sanction of exclusion and leave such cases for initial determination by the district courts under the private remedies provided to the trademark owner in § 1526(c). Indeed, the fact that the trademark owner is provided with the remedies of injunction and damages against private parties who have improperly dealt in the goods in the United States negates the idea that agency-initiated action in all cases is expected.

*Id.* at 1570, 225 U.S.P.Q. at 1003–04 (footnote omitted).

Therefore, the court held that the regulations were valid but not controlling with respect to the protection of § 526.

Thus, although the goods imported by defendants are not subject to *automatic exclusion* by Customs under the regulations, I conclude that they do cause confusion under § 42 and may be excluded under § 526. As the court noted in *Vivitar,* the *regulations* do not determine the scope of the statute. Although Customs would not initially exclude Lladro porcelain because of Weil's relationship to Lladro S.A. and Sodigei S.A., that does not mean that this court may not order such exclusion when there has been trademark infringement. In the present case, I have already concluded that there is no genuine issue of material fact that Weil has developed an independent goodwill. Weil acts as more than the importer of the trademarked goods. It is the entity which insures their quality, and defendants have failed to produce any evidence to contradict Weil's proof of a distinct goodwill. Similarly, there is no genuine dispute that defendants' *use* of genuine goods is likely to cause confusion. I now conclude for the same reasons that defendants' *importation* of genuine goods will also cause confusion.

The only remaining issue of fact which I can perceive that might preclude entry of summary judgment in favor of Weil on the third court concerns Weil's registration of its mark. Under both § 42 and § 526, Weil's mark is to be registered with the Department of Treasury. In order to have the goods excluded, therefore, Weil's mark should be recorded with Customs as provided in 19 C.F.R. § 133.0 *et seq.* Weil asserts in its complaint that it has "complied with the filing requirements of 19 U.S.C. § 1526(a)." ¶ 49. Defendants assert in their answer, however, that they are without knowledge of Weil's compliance. Since Weil has not formally moved for summary judgment, I will give the parties the opportunity to complete the record in this regard and with respect to any other factual issues

relating to the third count. Because of this limited gap in the record, I will not at this time award summary judgment in favor of Weil on the third count of its complaint.

## IV.  CONCLUSION

Defendants' motion for summary judgment will be granted on the First Count and denied on the Second and Third Counts.

Weil's motion for summary judgment will be denied on the First Count and granted as to liability on the Second Count.

Summary judgment on the Third Count as to liability will be granted in favor of Weil if Weil can demonstrate that there is no issue of material fact on the questions noted above.

Weil's complaint seeks a full range of relief under the Lanham Act and the customs laws. A determination of the appropriate relief to be granted will await further proceedings.

Weil's attorneys are requested to submit an appropriate order.