The FAMILY CIRCLE, INC., an Iowa Corporation, Appellant,

v.

FAMILY CIRCLE ASSOCIATES, INC., et al.

No. 14546.

United States Court of Appeals Third Circuit.

Argued Jan. 22, 1964.

Decided June 9, 1964.

A. Yates Dowell, Jr., Washington, D. C. (A. Yates Dowell, Washington, D. C., Gordon A. Philips, Trenton, N. J., on the brief), for appellant.

Norman N. Popper, Newark, N. J., (H. Harding Brown, Elizabeth, N. J., on the brief), for appellees.

Before BIGGS, Chief Judge and FORMAN and GANEY, Circuit Judges.

GANEY, Circuit Judge.

This is an appeal from the United States District Court for the District of New Jersey from a judgment entered in favor of the defendant, Family Circle Associates, Inc., as well as from an order denying appellant's motion for a new trial under rule 59(a), though the latter was not pressed in brief or in argument.

Suit was instituted by The Family Circle, Inc., publisher of the magazine variously entitled over the years Family Circle and Everywoman's Family Circle to enjoin Family Circle Associates, Inc., and Samuel Kane, Burton Kane, William Woolf, et al. from using "Family Circle" in their corporate and trade

name as the identifying name of the self-service department stores which are termed "discount stores", alleging trademark infringement and unfair competition. Family Circle Associates, Inc., the defendant, filed a counterclaim challenging the validity of plaintiff's trademark and seeking a cancellation of registration No. 617,878 which covers the trademark "Family Circle".

In a separate trial the court decided adversely to the defendant's counterclaim and no appeal was taken therefrom. At the trial of the main action now on appeal the plaintiff consented to the dismissal of the action against the various individual defendants and in an oral opinion the lower court dismissed the action holding that the defendant's use of "Family Circle" did not constitute trademark infringement or unfair competition.

█ This court has jurisdiction under the provisions of 28 U.S.C. 1338(b). This was enacted in order that it might avoid piecemeal litigation in the enforcement of common-law and statutory copyright, patent and trademark rights by permitting such enforcement in a single civil action in the district court. This enactment was preceded by the Court's decision in Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, wherein it was held that a federal district court might accept jurisdiction of a non-federal issue, such as unfair competition, which is related to a substantial federal issue, one arising under the patent or copyright laws of the United States, if it appears that both the federal and non-federal issues rest on the same facts.

The main factual elements are not in dispute and are as follows: In 1932 the plaintiff's predecessor published a magazine entitled Family Circle which was sold at a low price to chain grocery stores and supermarkets which, in turn, distributed it gratis to their customers. Later, they sold the magazine to customers for 5, 7 and 10 cents per copy and it was almost always displayed near the cash register or in a rack near the check-out counter at the store outlet.

No subscriptions to the magazine have ever been secured and all purchases are voluntarily made.

The record shows that on October 29, 1940, the assignor of the plaintiff registered the trademark "Everywoman's" for a monthly magazine and on December 20, 1955, a predecessor in title to plaintiff registered the trademark "Family Circle" (Registration No. 617,878) for a monthly magazine. On April 16, 1958, the plaintiff acquired title to the "Family Circle" trademark by a merger between Everywoman's magazine and Family Circle magazine. In May of 1958, Family Circle stopped publication and the first edition of Everywoman's Family Circle was published in June of 1958 and the trademark "Everywoman's Family Circle" was registered on April 7, 1959.

Pursuant to 15 U.S.C.A. 1058(a) and 15 U.S.C.A. 1065, the plaintiff, on December 27, 1960, timely filed an affidavit asserting that it was using the trademark "Family Circle". The trademark "Everywoman's Family Circle" has been in continuous use by the plaintiff since May, 1958, up until a short time before the trial of this cause when, in 1963, it reverted back to the original trademark "Family Circle".

The magazine has a coverage throughout the United States in 2900 of the 3100 counties of this country, as well as in Canada, Belgium, Australia and other foreign countries. A large percentage of chain grocery stores and supermarkets, as well as numerous individual grocers distribute the plaintiff's publication. For example, the Food Fair chain has distributed it since 1938; Safeway since 1933; First National since 1936; Grand Union since 1948 and American Stores since 1933, amongst others. The magazine was issued originally as a weekly, but is now published monthly and has grown in circulation since 1932, when it distributed 256,647 copies weekly and today it averages 7,000,000 copies monthly. Large sums of money have been spent in advertising and promoting the magazine, for example, $159,000 in 1961 and $225,000 in 1962. The gross advertising reve-

nue of the plaintiff's magazine is in excess of $12,000,000.

The appeal of the magazine has been directed primarily to the homemaker, its content including service features on foods, child care, home furnishings, family health, personal grooming, fashions and items of general interest to the housewife. The advertisements therein principally feature food and grocery items, health and beauty aids, household equipment, supplies and furnishings, etc. The record further discloses that Family Circle, as has been indicated, is a service magazine which helps to solve the problems of the housewife, whether it was buying a dress, cooking a meal, raising a child or furnishing a home, and was directed to an audience of full-time homemakers, middle-income groups earning $4,000 to $10,000 a year and to those who devote their entire life to keeping a happy, healthy family going. There is nothing to help the working girl or the retired woman, but it aims pointedly at the problems of the young, middle-income homemaker, who supervises the activities of the entire family circle, that is, she handles the finances, balances the budget, keeps the house, does the sewing and runs the family.

In the counties of Monmouth and Ocean in the state of New Jersey, where the defendants' stores are in operation, the plaintiff had some twenty-eight outlets before 1955, and on October 1, 1957, it had some thirty-four outlets for the magazine, one of these being the Grand Union outlet in Keansburg, New Jersey, which opened as a food supermarket, but later featured food together with household items, clothes, appliances, etc.

The trademark "Everywoman's Family Circle" on the magazine presents clearly and in large lettering of a peculiar style, the words "Family Circle" emphasizing them in much greater proportion than the word "Everywoman's" which is always at the top and to the left of the much larger type "Family Circle". Additionally, in their advertising in such magazines as Time and Advertising Age and The Saturday Evening Post the words "Family Circle" are used alone without any reference to "Everywoman's".

There are 27,000 retail outlets distributing the magazine throughout the United States and every month the cover thereof changes with, however, the trademark, "Everywoman's Family Circle" being thereon set out, as has been indicated, "Family Circle" in much larger proportion in size than the word "Everywoman's". As an example of some cover subjects, the month of February featured fashion; May, kitchen equipment; July, food; November, food and in December a cover suitable for Christmas.

The history of the defendants' operation is as follows: Samuel Kane and Burton Kane, in 1956, were manufacturing women's garments and it was testified that they attended the opening of "Family Bargain Store" early in 1957, which gave them the inspiration for a new venture, the "discount department store" which was then in its early stage. They regarded the word "family" as very important and they finally decided on "Family Circle" as the name for their new venture in the discount department store field. Samuel Kane testified that he did not know of the existence of the magazine Family Circle, but only learned of it about a year before he gave his deposition in connection with this action. The name "Family Circle" was presented along with three other names to the family attorney, now deceased, and defendants were advised by him that they could use the name "Family Circle Stores", which they have since used. Defendants began the operation of their first store, as a single discount store, in 1957, using the name "Family Circle". It was a fairly large store containing 96,000 square feet and employing 100 persons. "Laurelton Family Store" was incorporated next and it was opened on October 19, 1961. A third store is contemplated in Eatontown, New Jersey. These stores are located in Ocean and Monmouth Counties and use the name "Family Circle", however, the words "Family Circle", in its lettering, have no

resemblance to the lettering "Family Circle" used by the plaintiff and, in one instance, the defendants impose the words "Family Circle" within a circle on the parking lot in front of their store and in another there is written in huge printed lettering on the front of the store the words "Family Circle Stores". They have a self-service supermarket type of operation with a large parking area and they are on the ground floor at one level with shopping carts and check-out counters and they offer a large range of products, including clothing, appliances, household articles and no chain food lines, but they do offer edibles, known as TV foods. While it does appear that the defendants' stores do have many features of a supermarket, self-service, carts, etc., the exteriors and interiors differ from the normal, ordinary supermarkets in that they do not have large window space, nor do they carry a general food line. The stores are operated as discount department stores, selling all the usual department store merchandise at a price below conventional retail stores. Neither the Keyport nor Laurelton store has ever offered the magazine Family Circle or Everywoman's Family Circle for sale nor displayed it at any time nor offered for sale any merchandise bearing the trademark "Family Circle" although prior to 1960, a few articles were sold bearing the mark "Family Circle" but they were discontinued in April, 1960, upon receipt of a letter from the plaintiff calling attention to the conflict in name. At the time of the receipt of the letter, the defendants' two stores had been in operation two and one-half years.

In a Prospectus offered in connection with a public issue of stock of defendant, Family Circle Associates, Inc., in 1962, defendants applied a prominent notice thereto, saying that Family Circle Associates, Inc., was not connected with Family Circle, Inc., the publisher of Everywoman's Family Circle magazine.

The editor of Family Circle magazine does not consider it a supermarket magazine and testified that he did not believe there was any difference in their concept of a magazine and that of Ladies' Home Journal, McCall's and Good Housekeeping, which are their largest competitors, but Family Circle has a different means of distribution and there is no particular class of goods exclusively advertised in Everywoman's Family Circle magazine or the present Family Circle magazine to the exclusion of other magazines. The Family Circle magazine does not cover high fashion since one of their first considerations is that an item be modestly priced and nationally distributed and has different problems than a magazine such as Vogue whose main problem is to report fashion trends at the very earliest moment. The fashions in Family Circle are geared to reality in that what they show in February is available across the country in March or April, and it tells people where they can buy them and how much they will cost.

Typical of the present issues is the one of February, 1963, where the front page shows advertising for Royal Vitamin C Gelatin, Vermont Maid Syrup, Puss-In-Boots Cat Food, St. Joseph's Aspirin and Vicks Cough Medicine. At one time a cosmetic kit was offered with a great variety of colors of cosmetics tied in with an editorial feature on how to make up your face and for one dollar a woman could buy samples of 50–75 different colors in order to try them out and see which one she liked best.

The defendants' new store, the Laurelton Store, located on Route 70 in Brick Township, New Jersey, has a lease on 60,000 square feet of area which the company entered into on October 19, 1961, and is the largest self-service discount department store in Ocean County, which has a population of 108,000, while the Keyport store, hereinabove adverted to, handles its customers from a radius of fifteen miles which covers a population of 650,000. The Laurelton Store is operated along the lines of the Keyport store, having the following departments: men's, women's, girls, boys, linens, toys, health aids, patent medicines, candies, cookies,

hardware, housewares, sporting goods, jewelry, luggage, auto accessories and cosmetics. Several of these departments are leased.

■ It is well settled that this court has authority to evaluate the facts and the determination of the ultimate facts is not bound by the "clearly erroneous" provision of Rule 52(a) of the Federal Rules of Civil Procedure. Sears, Roebuck & Co. v. Johnson, 219 F.2d 590 (3rd Cir.); Fleischmann Distilling Corp. v. Maier Brewing Co., 9 Cir., 314 F.2d 149.

■ The orthodox definition of "the primary and proper function of a trademark" is the one set out in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 412, 36 S.Ct. 357, 60 L.Ed. 713, which states that it is "to identify the origin or ownership of the goods to which it is affixed." Further, that the "origin or ownership" so described by the mark must be the "personal origin or ownership". Baglin v. Cusenier Co., 221 U.S. 580, 591, 31 S.Ct. 669, 55 L.Ed. 863. In order to entirely understand this definition which has been used by the court practically uniformly, but with the slightest variation, it may be in order to consider briefly usages of trade as well as certain historical data which help to illumine it.

The modern trademark has two historical roots, (1) the proprietary mark, which was usually affixed to goods by the owner, either for the benefit of illiterate clerks, or in order that in case of shipwreck or piracy, the goods might be identified and reclaimed by the owner, which was essentially a merchant's, rather than a craftsman's, mark, having nothing whatsoever to do with the source of the goods in question, and (2) the regulatory production mark, which was compulsorily affixed to goods by statute, administrative order or municipal or gild regulation, so that defective work might be traced to the guilty craftsman and heavily punished, or that "foreign" goods smuggled into an area over which a gild had a monopoly might be discovered and confiscated. This was a true mark of origin, designating the actual producer of the goods.[1]

Accordingly, in the early sixteenth century, a trademark was indicative either of the origin or ownership of the goods to which it was affixed and today the problem posed is to what extent does that trademark function as to either? As a matter of fact, as has been pointed out by the very courts that define trademarks in terms of ownership or origin, that owing to the ramifications of modern trade and international distribution of goods from the manufacturer to the jobber or importer and retailer to the consumer, the source or origin of the goods bearing a well-known trademark is seldom known to the consumer.

■ Later, the aim of equity was simply to prevent the deceitful sale or passing off of goods made by one person or firm for the goods made by another. "The diversion of custom" is the gravamen of the action in either "passing off" or "unfair competition" and the Supreme Court has held: "The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another. * * * This essential element is the same in trademark cases as in cases of unfair competition unaccompanied with trademark infringement." Hanover Star Milling Co. v. Metcalf, supra, 240 U.S. 412, 413, 36 S.Ct. 360. American Foods, Inc. v. Golden Flake, Inc., 5 Cir., 312 F.2d 619, 625. As noted in United Drug Co. v. Theodore Rectanus Company, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, a trademark is not a right in gross or at large, nor is there property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed. It is the accepted rule that infringement may be established by showing only that confusion is likely, and there need be no showing of actual confusion or deception if the mark is of such character or is used in such a way as to likely confuse a pro-

---

1. See Rational Basis of Trademark Protection by Frank I. Schechter, 40 Harvard Law Review 813.

spective buyer, Abramson v. Coro, Inc., 5 Cir., 240 F.2d 854, and it is also settled that the court in making its findings may rely not only on the evidence adduced at the trial, but on his own comparison of the marks. Coats v. Merrick Thread Co., 149 U.S. 562, 13 S.Ct. 966, 37 L.Ed. 847.

The injury in all the cases can only be gauged in the light of what has been said concerning the function of a trademark. It is the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non-competing goods. The more distinctive or unique is the mark, the deeper is the impression upon the public's consciousness and the greater its need for protection against vitiation or dissociation from the particular product in connection with which it has been used, and the rule that arbitrary, coined or fanciful marks or names on goods should be given a much broader degree of protection than symbols, words or phrases in common use would appear to be entirely sound.

Here, the similarity of the names of "Family Circle" as written is not so marked as to itself create the probability that reasonably prudent consumers would be confused, since in the manner in which the words "Family Circle" are written on the magazine and in connection with the stores of the defendant, there is no studied imitation either in appearance or by suggestion. Above all, the nature of its use on a magazine and on a store-front are so disparate that, although "Family Circle" has a secondary meaning, it is only such as to magazines and not as to stores such as a discount store here. Since the relationship of the magazines is as to food, wearing apparel, etc., the value, if any, the trademark has to the particular articles themselves is lost in an ocean of immensity by virtue of the tremendously wide variety of articles sold in the stores.

■ It was likewise proper for the court here to consider the testimony of the defendants that they acted in good faith and had no actual intention to mislead the public, as it was a factor to be considered along with all other evidence, Squirrel Brand Co. v. Barnard Nut Co., 5 Cir., 224 F.2d 840; Best & Co. v. Miller, 2 Cir., 167 F.2d 374, 377; Hyde Park Clothes, Inc., v. Hyde Park Fashion, Inc., 204 F.2d 223, 226.

An expert witness called by the plaintiff testified as to the likelihood or probability of confusion between the use and operation of the plaintiff's magazine and the name, use and operation of defendant's stores, and, likewise, an expert called by the defendant, using the same basis of assumed fact, denied that such confusion has or will or is likely to exist.

A survey was taken on December 5, 1962, one month before the pre-trial conference of January 7, 1963, wherein a number of persons were asked, (1) Do you know of the magazine, Everywoman's Family Circle or Family Circle? and (2) Do you believe that this store has any connection with that magazine? No person interrogated believed that there was any connection between plaintiff's Everywoman's Family Circle magazine and the defendant's "Family Circle" stores.

The court had before it expert witnesses and the persons who conducted the survey and had an opportunity to observe the demeanor of the witnesses and to weigh their testimony. It could have accepted the testimony of either, but it discarded the opinion of the plaintiff's expert in favor of the defendant's expert and found, as a fact, the defendants are not trading on the name or good will of the plaintiff.

The instant case is unlike Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509, where the plaintiff's mark was a "V" with a well-dressed girl wearing a hat standing in the middle of the "V" and the defendant's mark was a very similar "V" with a girl in the center wearing a large hat across which mark was written "Vogue Hats". The figure "V", in both instances, was of the same size. It appeared that sometime prior to adoption of the mark it was an interpreter of style and devoted a considerable share of its efforts and was a dominating factor in

the creation and promotion of styles in millinery. The court held that there was here an actual market competition between analogous products of plaintiff and defendant and that there was a fraud on the consumer. In our case, there was no such imitation of the plaintiff's mark, such as the V's here indicated, nor was there any similarity in the marks themselves in our case, such as the figure of a girl which was common to both marks in the Vogue case, and, additionally, the goods were of the same common lot, to wit, millinery.

Here we conclude that there was sufficient evidence on which the trial court could find, as it did, that there was no confusion or reason for the likelihood of confusion between the magazine of the plaintiff and the defendant's discount stores.

The judgment of the district court will be affirmed.