**PREMIER DENTAL
PRODUCTS COMPANY**

v.

**DARBY DENTAL SUPPLY COMPANY, INC., Dental Wholesalers, Inc., Spencer Meade Dental, Inc.**

Appeal of **DARBY DENTAL SUPPLY COMPANY, INC., Dental Wholesalers, Inc. and Spencer Meade Dental, Inc., Appellants.**

No. 85–1468.

United States Court of Appeals,
Third Circuit.

Argued Feb. 12, 1986.

Decided June 24, 1986.

Arnold I. Kalman (argued), Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellee.

Joel Salon (argued), Robert V. Marrow, Salon, Marrow & Dyckman, New York City, for appellants.

Robert Ullman, Steven R. Trost, Bass & Ullman, New York City, for amicus curiae American Free Trade Ass'n.

Before HIGGINBOTHAM and STAPLETON, Circuit Judges, and TEITELBAUM, District Judge.[*]

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

### I

Appellee Premier Dental Products Company ("Premier") is a wholesale distributor of dental products. Premier includes in its inventory a denture impression material produced by a West German manufacturer, ESPE Fabrik Pharmazeutischer Praparate, GmbH ("ESPE"), and distributed in this country under the registered trademark "IMPREGUM." Premier and ESPE are independent firms. IMPREGUM is a patented material used to make impressions for dentures, removable prostheses and full crowns.

In 1974, ESPE granted Premier the exclusive right to market and distribute IMPREGUM in the United States. ESPE reserved the right to cancel this distributorship should Premier's sales volume of IMPREGUM for any two-year period fall below the maximum sales volume achieved by Premier in any single year.

Appellants Darby Dental Supply Company, Inc., Dental Wholesalers, Inc., and

Spencer Meade Dental, Inc. ("Darby") are mail-order purveyors of dental products. Darby sells dental impression materials, including IMPREGUM, to both dentists and dental supply companies. Until 1982, Darby purchased its stock of IMPREGUM from Premier. Thereafter, Darby obtained access to the European-marketed version of IMPREGUM and began to sell it in the United States at a lower price than offered by Premier.[1]

On June 20, 1984, ESPE assigned to Premier all its "right, title and interest" in the United States trademark "IMPREGUM." This assignment was recorded in the Patent and Trademark Office and with the Customs Service. The principal provisions of the assignment are as follows:

WHEREAS, Premier wishes to obtain title to the registration for "IMPREGUM", including the right to file suit for infringement thereof, and ESPE is willing to assign said registration to Premier for that limited purpose, ...

IT IS MUTUALLY AGREED AS FOLLOWS:

1. Subject to the terms and conditions of this agreement, ESPE hereby agrees to assign to Premier all right, title and interest in and to the trademark "IMPREGUM" and the registration therefor (hereinafter the "Trademark"), together with the goodwill of the business connected with the use of and symbolized by said Trademark, as well as the right to sue for infringement of the Trademark or injury to said goodwill....

2. Subject to the faithful performance of the terms of this agreement, Premier grants back to ESPE the sole and exclusive right to manufacture products to be sold under the Trademark "IMPREGUM" for sale in the United States.

3. Premier and ESPE recognize that it is necessary to maintain the quality of

[*] Honorable Hubert I. Teitelbaum, United States District for the Western District of Pennsylvania, sitting by designation.

1. In 1982, Darby's purchases of IMPREGUM constituted 15% of Premier's total IMPREGUM sales. In the first eleven months of 1984, Darby's purchases represented only 0.26% of the total. Premier's overall sales of IMPREGUM to all customers declined by approximately 20.3% between 1982 and 1984.

the goods sold under the Trademark and ESPE shall maintain the same quality of goods it has manufactured heretofore.

4. The purpose of this Agreement is to permit Premier to act against infringers and unauthorized importers of IMPREGUM trademarked products into the United States ...

5. Premier shall take no action with respect to the Trademark and/or said registration which shall in any way dilute or damage the goodwill associated therewith.

6. ... Premier further agrees and warrants that it shall not assign the Trademark or the title vested in it to any other party ... In the event that ESPE desires to have the trademark as well as the goodwill and all rights and title to the registration reassigned to it, it shall give Premier thirty (30) days notice and Premier shall execute a reassignment to ESPE ...

7. Premier ... agrees that it shall not reassign, or take any action with respect to the Trademark "IMPREGUM" and said registration unless it shall have given to registrant [ESPE] ninety (90) days written notice of the action it intends to take....

The European-marketed IMPREGUM is identical in substance to Premier's version. However, there are differences in the products' packaging. The American packaging is written only in English while the European version is written in English and German. ESPE's name appears alone on the European version of IMPREGUM. The American version, which until the 1984 assignment referred to Premier only on the cartons containing IMPREGUM, now displays the Premier trade name on most of the IMPREGUM tubes and bottles. Also, after the assignment, the American packaging was changed to make the ESPE name more prominent and to indicate that Premier is the distributor. Premier composed the instructions for the American version, which are in English. The instructions for the European version were not written by Premier and are printed in German, French, Italian, and Spanish as well as in English. However, both sets of instructions are substantially the same.

After Darby failed to accede to Premier's requests that it desist from importing and selling the European-marketed IMPREGUM, Premier brought this suit in district court and moved for a preliminary injunction. Premier alleged that Darby's importation of IMPREGUM violates Section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, and Sections 32, 42 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1124, and 1125. The district court granted Premier's request for a preliminary injunction on the grounds that Premier, as the owner of the American trademark "IMPREGUM," was entitled to assert Section 526 of the Tariff Act of 1930 against Darby. Darby appealed to this court.

## II

### THE STANDARD OF REVIEW

Before a district court may issue a preliminary injunction it must consider whether the movant has shown that it is likely to prevail on the merits, whether the movant has shown irreparable harm in the absence of such relief, whether such relief will substantially harm other parties, and where the public interest lies. *See Commonwealth of Pennsylvania v. United States,* 469 F.2d 1387 (3d Cir.1972).

On appeal, the standard of review of a preliminary injunction issued by a district court is narrow. Unless an abuse of discretion is "clearly established, or an obvious error has ocurred in the application of the law, or a serious and important mistake has been made in the consideration of the proof, the judgment of the trial court must be taken as presumptively correct." *Stokes v. Williams,* 226 F. 148, 156 (3d Cir.1915); *see S.I. Handling Systems v. Heisley,* 753 F.2d 1244, 1248 (3d 1985); *Tustin v. Heckler,* 749 F.2d 1055, 1060 (3d Cir.1984); *A.O. Smith v. FTC,* 530 F.2d 515, 525 (3d Cir.1976).

## III

### A. *THE ASSIGNMENT TO PREMIER*

Section 526(a) of the Tariff Act of 1930, with limited exceptions not applicable here, proscribes the importation of any foreign-manufactured merchandise that "bears a trademark owned by a citizen of the United States." This section must, therefore, be read in conjunction with the trademark law doctrines that determine trademark ownership.[2] *See Vivitar Corp. v. United States*, 761 F.2d 1552 (Fed.Cir.1985), *cert. denied* — U.S. —, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *Model Rectifier Corp. v. Takachiho International, Inc.*, 709 F.2d 1517, 221 U.S.P.Q. 502 (9th Cir.1983); *Bell & Howell; Mamiya Co. v. Masel Supply Co.*, 548 F.Supp. 1063 (E.D.N.Y.1982), *vacated on other grounds*, 719 F.2d 42 (2d Cir.1983).

A trademark symbolizes the public's confidence or "goodwill"[3] in a particular product. However, it is no more than that, and is insignificant if separated from that confidence. Therefore, a trademark "is not the subject of property except in connection with an existing business." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed.2d 141 (1918); *Family Circle v. Family Circle Assoc.*, 332 F.2d 534 (3d Cir.1964).

A trademark serves several purposes. It allows buyers to identify the goods to which it is affixed as from a particular source and distinguishes those goods from similar merchandise of others. Also, the mark often signifies that all goods bearing that mark are of like quality. Finally, the mark is valuable in the advertising and sale of the trademarked goods. *See generally*, 1 J. McCarthy, *Trademarks and Unfair Competition* § 3.1. (2d ed. 1984).

Because a trademark is symbolic, it may be transferred or assigned only to represent the transfer of goodwill connected with a particular business, *Dresser Industries v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 464 (3d Cir.) *cert. denied* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968), and cannot be transferred separately from the goodwill of the business. *United Drug*, 248 U.S. at 97, 39 S.Ct. at 50; *Dresser Industries*, 395 F.2d at 464; *Family Circle*, 332 F.2d 534; 15 U.S.C. § 1060;[4] *see Marshak v. Green*, 746 F.2d 927 (2d Cir.1984); *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 260–61 (C.C.P.A.1978); *Pepsico, Inc. v. Grapette Co.*, 416 F.2d 285, 287 (8th Cir.1969); 1 McCarthy, *supra*, at § 18.1. However, following a proper assignment, the assignee steps into the shoes of the assignor.

It is well established that a distributor may own the trademark in goods it does not manufacture. *See, e.g., Menendez v. Holt*, 128 U.S. 514, 520, 9 S.Ct. 143, 144, 32 L.Ed. 526 (1888); *Energy Jet, Inc. v. Forex Corp.*, 589 F.Supp. 1110 (E.D.Mich.1984); *Wrist-Rocket Manufacturing Co. v. Saunders*, 379 F.Supp. 902 (D.Neb.1974), *rev'd in part* 516 F.2d 846 (8th Cir.), *cert denied*

---

**2.** Section 526(a) bars imports only if the trademark is recorded with the Customs Service pursuant to 15 U.S.C. § 1124, which permits only the owner of a trademark to register the trademark. *See* 19 C.F.R. § 133.3(a)(1) (1985).

**3.** "Goodwill" is the advantage obtained from use of a trademark. This includes public confidence in the quality of the product and in the warranties made on behalf of the product, and the "name recognition" of the product by the public that differentiates that product from others. As Professor McCarthy explains:

"Good will is not a tangible, physical object that can be seen, felt and tasted. Its real existence is in the minds of the buying public.... [It] is a business value which reflects the basic human propensity to continue doing business with a seller who has offered goods and services which the customer likes and has found adequate to fulfill his needs.... '[It] is that which makes tomorrow's business more than an accident,' ... 'all that good disposition which customers entertain towards the house of business identified by the particular name or firm and which may induce them to continue giving their custom to it.' "

1 J. McCarthy, *Trademarks and Unfair Competition* § 2.8 at 72–73 (2d ed. 1984) (footnotes omitted).

**4.** 15 U.S.C. § 1060 states that "A registered mark ... shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark...."

423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975); 15 U.S.C. § 1127.[5] As Professor Callmann has written,

> The use of a trademark does not necessarily and as a matter of law import that the articles upon which it is used are manufactured by its user. It may be enough that they are manufactured for him, that he controls their production, or even that they pass through his hands in the course of trade, and that he gives to them the benefit of his reputation, or of his name and business style. The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it.

Callmann, *Unfair Competition, Trademarks and Monopolies* § 17.16 (4th ed., 1981); *See Wrist-Rocket Manufacturing Co.*, 516 F.2d at 851; *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796, 806 (D.Del.1920); *Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.*, 299 F.Supp. 868, 874 (E.D.Mich.1968), *aff'd* 411 F.2d 792 (6th Cir.1969).

The ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement. *Model Rectifier Corp. v. Takachiho International, Inc.*, 220 U.S. P.Q. 508, 510 (C.D.Calif.1982), *aff'd* 709 F.2d 1517, 221 U.S.P.Q. 502 (9th Cir.1983); *Mort Wolson Assoc. v. Blaine/Worthington Enterprises*, 211 U.S.P.Q. 146 (S.D.N.Y.1980); *In re George Ball*, 153 U.S.P.Q. 426, 427 (T.T.A.B.1967); 1 McCarthy, *supra*, at § 16:16. In the case at bar, it is not disputed that Premier and ESPE have agreed that Premier should own the United States trademark in IMPREGUM.

While the parties' agreement is important in settling the question of ownership, it is not dispositive. The ownership of the product's goodwill must also be determined. "The intent of the parties to create ... a perception [that a particular firm is the legal entity standing behind the mark]

... is not conclusive evidence of what the public actually did perceive but is circumstantial proof, absent evidence to the contrary, that what the parties intended to be the public perception was, in fact, their actual perception." Callmann, *supra*, at § 19.17; *see General Business Services, Inc. v. Rouse*, 495 F.Supp. 526, 534 (E.D. Pa.1980); 2 McCarthy, *supra*, at 16:15–16:16.

If the public believes that the exclusive distributor is responsible for the product, so that the trademark has come, "by public understanding, to indicate that the goods bearing the trade-mark come from plaintiff although not made by it." *A. Bourjois & Co. v. Katzel Co.*, 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923), or if the distributor has obtained "a valuable reputation for himself and his wares by his care in selection of his precautions as to transit and storage, or because his local character is such that the article acquires a value by his testimony to its genuineness," Callmann, *supra*, at 17.16, that is proof that he possesses the goodwill associated with the product. *See E. Leitz, Inc. v. Watson*, 152 F.Supp. 631, 635–36 (D.D.C.1957), *aff'd* 254 F.2d 777 (D.C.Cir.1958); *Weil Ceramics & Glass, Inc. v. Dash*, 618 F.Supp. 700, 711 (D.N.J.1985); *Royal Silver Manufacturing Co. v. National Silver Co.*, 61 F.Supp. 232, 236 (S.D.N.Y.1945); Callmann, § 17.16–17; Derenberg, *Territorial Scope and Situs of Trademarks and Goodwill*, 47 Va.L.Rev. 733, 745–47 (1961); Callmann, *Unfair Competition with Imported Trademarked Goods*, 43 Va.L.Rev. 323, 329–33 (1957).

In applying these principles to the case at bar, we first observe that the goodwill associated with IMPREGUM is that which derives from the reputation of IMPREGUM and differentiates IMPREGUM in the public's mind from other, similar products. Therefore, he who controls the nature and quality of the goods on which the IMPREGUM trademark appears, or whom the public regards as standing behind IMPRE-

---

**5.** 15 U.S.C. § 1127 defines a trademark as "any word, name, symbol, or device or any combination thereof adopted and used by a manufactur-er *or merchant* to identify his goods and distinguish them from those sold by others" (emphasis added).

GUM, possesses the goodwill in the IMPREGUM trademark.

Premier claims that it, as the exclusive American distributor of IMPREGUM, created the domestic goodwill for IMPREGUM. Premier has been the exclusive United States wholesaler of IMPREGUM since 1974 and has spent a considerable amount of time and money in promoting the product in the United States. It guarantees customer satisfaction with IMPREGUM. Through its long tenure as the exclusive domestic wholesaler of IMPREGUM, Premier has come to be, in the words of the district court, "identified in the trade as the source through which IMPREGUM is obtained." We take this to indicate that, in this country, the IMPREGUM trademark indicates that the goods bearing it come from Premier, although not made by it. *Bourjois*, 260 U.S. at 692, 43 S.Ct. at 245; *see Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924).

Premier asserts that because it had developed this goodwill, and possessed it at the time of the June, 1984 agreement with ESPE, ESPE could effectively transfer to it legal title to the American trademark IMPREGUM. The district court agreed with Premier and found, for the purposes of the preliminary injunction, that Premier was likely to prevail on the merits on this point. It supported its conclusion by the following findings of fact:

"Premier has developed a goodwill separate from that of ESPE. Premier has provided seminars and instructions to those wishing to learn about the product. It has provided a toll-free telephone number for the use of those with questions or problems with the product and is identified in the trade as the source through which IMPREGUM is obtained.... The exclusive distributorship allowed Premier to use, develop and take advantage of the trademark's goodwill. The assignment did not simply transfer the right to sue, it gave Premier legal title to the goodwill that it has used and the right to protect the exclusive distributorship.

Premier has the interest in the goodwill associated with IMPREGUM that is required in a transfer of the trademark."

The district court's findings indicate that Premier has "obtained a valuable reputation for [it]self and [its] wares by [its] care in selection of ... precautions as to transit and storage, ... [and that] its local character is such as that the article acquires a value by [its] testimony to its genuineness." Callmann, *Unfair Competition, Trademarks, and Monopolies, supra*, at § 17.17.

■ The finding that Premier possesses goodwill in IMPREGUM in the United States is not clearly erroneous. On the basis of this finding, we perceive no legal impediment to carrying out the express intent of the parties that title to the United States IMPREGUM trademark be transferred from ESPE to Premier. Accordingly, we hold that the district court committed no legal error in concluding that Premier owned the United States IMPREGUM trademark following the assignment of June 1984.

Darby resists this conclusion primarily on two grounds. First, it argues that the assignment agreement is a sham. It points out that, after the assignment as well as before, (1) ESPE remained the sole original source of IMPREGUM, (2) ESPE retained a substantial amount of control over the use of the mark and the right to require that it be reassigned, and (3) while ESPE contractually committed itself to maintain the quality of the product during the term of the agreement, Premier exercised no day-to-day quality control function. Second, Darby emphasizes the observation of the district court that Premier had "failed to establish that IMPREGUM is associated with it in the minds of the consumers of the product," namely dentists and dental technicians. We find neither argument persuasive.

The agreement between Premier and ESPE undeniably circumscribes Premier's rights over the IMPREGUM trademark. Nonetheless, Premier may still own the trademark. It is a well-established princi-

ple both of contract law and of trademark law that limitations in an otherwise valid assignment do not invalidate it. *See Bandai America, Inc., v. Bally Midway Mfg. Co.,* 775 F.2d 70, 73–74 (3d Cir.1985), *cert. denied* —— U.S. ——, 106 S.Ct., 1265, 89 L.Ed.2d 574 (1986) (assignment subject to termination upon certain conditions); *Andrew Jergens Co. v. Woodbury, Inc.,* 273 F. 952 (D.Del.1921), *aff'd* 279 F. 1016 (3d Cir.) *cert. denied* 260 U.S. 728, 43 S.Ct. 92, 67 L.Ed. 484 (1922) (rights reserved in assignor); *Model Rectifier,* 220 U.S.P.Q. at 510–11 (same); *In Re George Ball,* 153 U.S.P.Q. at 426–28 (assignment terminable on six months notice); 1 McCarthy, *supra,* at §§ 16.17, 18.1; *see also Restatement (Second) of Contracts,* § 331 (1981); 6A C.J.S., *Assignments,* § 78 (1975). The assignment between ESPE and Premier is therefore not invalidated by virtue of the limitations it imposes on Premier's rights over the trademark.

Moreover, while the identity of the party exercising day-to-day control over the quality of a product is often relevant to trademark analysis, it is not essential that one perform this function to own a trademark. As we have earlier observed, one need not manufacture a product to possess goodwill in it. In particular, it has been consistently held that if an exclusive distributor is known as the exclusive domestic source and as the one who stands behind the product in this country, it may own and enforce the trademark. *See Prestonettes, Inc. v. Coty, Inc.,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924); *Bourjois v. Katzel,* 260 U.S. 689, 692, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923); *Leitz, Inc. v. Watson,* 152 F.Supp. 631, 635 (D.D.C.1957), *aff'd* 254 F.2d 777 (D.C.Cir.1958); *Weil Ceramics & Glass, Inc.,* 618 F.Supp. at 711–13; 1 McCarthy, *supra,* §§ 16.15–16.16.

■ Finally, we do not believe that the fact that the exclusive distribution agreement preceded the assignment makes the assignment any less valid. *See In Re George Ball,* 153 U.S.P.Q. at 427; *Avedis Zildjian Co. v. Fred Gretsch Manufacturing Co.,* 251 F.2d 530, 532 (2d Cir.1958).

Turning to Darby's second point, we think that the district court's observation that consumers have not been shown to associate IMPREGUM with Premier must be interpreted in light of the court's express finding that Premier "is identified in the trade as the source through which IMPREGUM is obtained" in the United States. Darby reads these findings to indicate that, while intermediaries in the chain of distribution associate IMPREGUM with Premier, the ultimate customers do not. We do not understand the district court's use of "the trade" to have so limited a meaning. Rather, we believe that the district court concluded that purchasers of IMPREGUM at all levels understand that it comes from a single source even though the ultimate consumers were not shown to have realized that Premier was that single source.

Reconciling these two findings in this way, we are not persuaded by Darby's argument. While we agree that trademark law focuses upon the consuming public, *see Dresser Industries,* 395 F.2d at 462, "it is of little significance to the establishment of trademark rights whether the public can identify correctly by name the owner of the mark." *Weil Ceramics & Glass, Inc.,* 618 F.Supp. at 712 (quoting *Osawa and Co. v. B & H Photo,* 589 F.Supp. 1163, 1179 (S.D. N.Y.1984). Therefore, the consuming public need not know of Premier by name.

■ What is relevant is whether the trademark has become sufficiently associated with Premier to justify the inference that buyers under that name are its customers. It is enough "if the article be known as coming from a single, though anonymous source." *Coty, Inc. v. LeBlume Import Co., Inc.,* 292 F. 264, 267 (S.D.N.Y.), *aff'd* 293 F. 344 (2d Cir.1923). *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.,* 221 F.2d 464 (2d Cir.) *cert. denied* 350 U.S. 832, 76 S.Ct. 67, 100 L.Ed. 743 (1955); *Weil Ceramics & Glass Co.,* 618 F.Supp. at 712; 1 McCarthy, *supra,* at §§ 3.2–3.4.

The statement of the district court relied upon by Darby, when read in context with

the court's other findings, indicates only that, while IMPREGUM is seen as emanating from a single domestic source, consumers do not know who that source is. As discussed above, this anonymity has no effect upon Premier's status as the trademark owner.

## B. *SECTION 526*

Section 526, quoted in the margin,[6] proscribes the unauthorized importation into the United States of merchandise bearing a trademark owned by a United States citizen. As we have noted, we will uphold the district court's factual determination that the trademark IMPREGUM is owned by Premier, an American corporation. Darby's unauthorized importation and sale of merchandise bearing the IMPREGUM trademark is therefore apparently subject to injunction by the authority of Section 526(c).

Darby seeks to avoid this conclusion with the argument that Section 526 was intended by Congress to refer solely to foreign-produced *imitations* of goods marked with an American-owned trademark. Darby posits that Section 526 applies only to prevent the fraud or confusion created by the importation of imitation goods. Because the IMPREGUM Darby sells is the same product as is sold by Premier, and because neither Premier nor Darby alters the product or markings after receiving it, Darby suggests that there can be no confusion and therefore Section 526 cannot apply.

We disagree. The statutory language is broad and unambiguous. It declares illegal the unauthorized importation of *any* merchandise of foreign manufacture bearing a domestically-owned trademark. Moreover, the legislative history amply demonstrates Congress's intent to bar imports even of "genuine" goods, where the importation is not authorized by the domestic trademark owner. That legislative history is reviewed in detail in *Coalition To Preserve The Integrity Of American Trademarks v. United States*, 790 F.2d 903, 913–18 (D.C.Cir. 1986) and will not be repeated here. *See Vivitar*, 761 F.2d at 1561–68; *Sturges v. Pease*, 48 F.2d 1035, 1038 (2d Cir.1931); H.R.Rep. No. 1223, 67th Cong., 2d Sess. 158 (1922); 62 Cong.Rec. 11603 (August 19, 1922) (remarks of Sen. Sutherland). *Id.* at 11604 (Remarks of Sen. Simmons). *Id.* at 11607 (Remarks of Sens. Lenroot and McCumber); Note, 64 Yale L.J. at 567; Derenberg, *supra*, 47 Va.L.Rev. at 745–47.

Furthermore, *Bourjois v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), decided shortly after Section 526's enactment, but without reference to it, is to the same effect. In *Bourjois*, the Supreme Court relied upon general principles of the law of unfair competition to find that, although the defendant was importing the same goods as the plaintiff was selling, defendant's sale created confusion as to who stood behind the trademark. "Since the goods which defendant was selling did not 'come from' the plaintiff Bourjois in the sense of sponsorship, while the public would attribute such goods to the plaintiff, defendant's sale ... infringed plaintiff's

---

**6.** Section 526 provides:

(a) Except as provided in subsection (d) of this section, it shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise, or the label, sign, print, package, wrapper, or receptacle, bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States, and registered in the Patent and Trademark Office by a person domiciled in the United States, under the provisions of sections 81 to 109 of Title 15, and if a copy of the certificate of registration of such trademark is filed with the Secretary of the Treasury, in the manner provided in section 106 of said title 15, unless written consent of the owner of such trademark is produced at the time of making entry.

(b) Any such merchandise imported into the United States in violation of the provisions of this section shall be subject to seizure and forfeiture for violation of the customs laws.

(c) Any person dealing in any such merchandise may be enjoined from dealing therein within the United States or may be required to export or destroy such merchandise or to remove or obliterate such trademark and shall be liable for the same damages and profits provided for wrongful use of a trademark, under the provisions of sections 81 to 109 of Title 15....

rights." *Bourjois,* 260 U.S. at 692, 43 S.Ct. at 245.

As the Court subsequently described the case, *Bourjois* protected a trademark that "indicated that the goods came from the plaintiff in the United States, although not made by it, and therefore [the trademark] could not be put upon other goods *of the same make* coming from abroad." *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) (emphasis added);[7] *see Weil Ceramics & Glass, Inc.,* 618 F.Supp. at 704–06.

This broad protection for the American trademark owners of foreign manufactured products has been criticized, especially when invoked by an American subsidiary of the foreign manufacturer. *See Coalition To Preserve The Integrity Of American Trademarks v. United States,* 790 F.2d 903, 913–918 (D.C.Cir.1986); *Vivitar; U.S. v. Guerlain,* 155 F.Supp. 77 (S.D.N.Y. 1957), *vacated and remanded* 358 U.S. 915, 79 S.Ct. 285, 3 L.Ed.2d 236 (1958), *action dismissed* 172 F.Supp. 107 (S.D.N.Y.1959); Callmann, 43 Va.L.Rev. at 331–33; Bicks, *Antitrust and Trademark Protection Concepts in the Import Field,* 49 Trademark Rep. 1225 (1959); Note, 71 Harvard L.Rev. 564 (1958); Note, 64 Yale L.J. 557 (1955). This criticism has also been directed at the application of Section 526 when the American company is not related to the foreign manufacturer. *See, e.g.,* Note, 64 Yale L.J. at 563–64, 567. We conclude, however, that the original intent of Congress is clear and that the desirability of a change in the law is an issue for legislative resolution.

Therefore, we conclude that where a trademark is owned and registered in this country by an exclusive distributor who is independent of the foreign manufacturer and who has separate goodwill in the prod-

uct, the distributor is entitled under Section 526 to prevent the importation even of genuine merchandise obtained from the same foreign manufacturer.

## IV

### A. *IRREPARABLE HARM*

For a preliminary injunction to issue, there must be a showing of immediate irreparable harm, or a presently existing actual threat of harm. *Continental Group v. Amoco Chemicals Corporation,* 614 F.2d 351 (3d Cir.1980). The harm must be imminent. *Cerro Metal Products v. Marshall,* 620 F.2d 964 (3d Cir.1980).

The district court found that because the IMPREGUM sold by Darby was identical to that sold by Premier, Premier's goodwill and reputation were not in danger. Nonetheless, the district court found there to be a risk of irreparable harm if other "gray marketeers," following Darby's example, begin to sell the imported IMPREGUM. Were that to happen, the court reasoned, Premier might lose its exclusive distribution contract with ESPE. This, according to the district court, "would constitute irreparable harm."

Such a loss may perhaps be forestalled by a preliminary injunction, but, according to the agreement between ESPE and Premier, ESPE is able to cancel Premier's exclusive selling rights only if unit sales volume to Premier of IMPREGUM in any two year period falls below the volume of the product's single maximum sales year. The record does not provide a basis for evaluating the propinquity of this harm. The only information in the record relates to the sales volume of IMPREGUM by Premier as measured in *dollars.* This information is

---

7. *Leitz, Inc. v. Watson,* 152 F.Supp. 631, 635 (D.D.C.1957), *aff'd* 254 F.2d 777 (D.C.Cir.1958) (emphasis added), characterized the holding of *Bourjois* as follows:

The trademark does not necessarily signify the goodwill of the manufacturer. The purchaser of the United States business of a foreign manufacturer and vendor, including

goodwill and trademarks, has a right to protect his trademark in the United States against the sale of the *same product from the same manufacturer by others, even if it be by the manufacturer-owner of the trademark abroad,* where the product is seen as emanating in the United States or through the United States trademark owner.

reproduced in the footnote.[8] The decline in sales volume of IMPREGUM, as measured in dollars, does not suggest that there is any immediate danger that the exclusive distribution agreement will be cancelled. As a result, when the district court issued its opinion in July, 1985, the record could not support the conclusion that there was an immediate threat to the exclusive distributorship.

■ Nonetheless, we believe that Premier has made a showing of irreparable harm sufficient to support the district court's order. The district court erred when it concluded that "[a]lthough the defendants would be trading on goodwill established by the plaintiff, goodwill and reputation are not harmed by the sale of identical products." The goodwill associated with the IMPREGUM mark, which is owned by Premier, exists principally because Premier is known as the exclusive domestic source of IMPREGUM and as the company that stands behind the product. The value of the mark to Premier is largely determined by its connotation of a single source who stands behind the product.

Purchasers of Premier's IMPREGUM are confident they can obtain the same product, service, and financial guaranties that they have gotten before. The continued availability of IMPREGUM through sources, like Darby, not associated with Premier must inevitably injure Premier's reputation as the exclusive domestic source of IMPREGUM. This would constitute irreparable injury to the value of the mark because customers would no longer have that same confidence. This is true whether or not the service and financial guaranties are comparable to those offered by Premier. We find this proposition the inevitable corollary of *Bourjois.*

In *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42 (2d Cir.1983), which vacated a district court's preliminary

injunction because there had been an insufficient showing of irreparable harm, the Second Circuit appeared to require a showing of confusion as to the *origin* of the gray market goods or of injury to the domestic distributor's reputation caused by *inferior* gray market goods sold under the distributor's trademark. 719 F.2d at 46. We respectfully disagree with this view. As previously indicated, we believe that *Bourjois* and Section 526 make it clear that an American distributor's goodwill can be harmed even by the sale of gray market goods that are *identical* to those sold by the distributor.

The *Bell & Howell* court also believed that the parallel importers, through printed disclaimers, could avoid any claimed confusion as to origin. 719 F.2d at 46. Because we find that the relevant issue is not the ultimate origin of the materials, which is ESPE, but Premier's reputation as the exclusive American source for IMPREGUM, such disclaimers are not effective to avert the threatened injury. *See Model Rectifier,* 220 U.S.P.Q. at 510.

## V

The final inquiry for this Court is whether the district court abused its discretion by finding that the preliminary injunction would not substantially harm other parties and that the public interest favored entry of the order.

The district court, as a condition of the preliminary injunction, required Premier to supply Darby with IMPREGUM on the same terms and conditions as Premier's other customers. We are satisfied that this adequately protects Darby's interests.

Furthermore, we agree with the district court that Darby has raised no colorable argument to support its claim that the federal antitrust laws are implicated by this injunction. *See Bell & Howell: Mamiya*

**8.** Sales volume of IMPREGUM, 1980–1984 (11 mos.):

| Year | Sales Volume | |
|---|---|---|
| 1980 | $5,188,647 | |
| 1981 | | $6,481,790 |
| 1982 | | $7,129,314 |
| 1983 | | $6,825,498 |
| 1984 | | $5,562,460 (11 mos.) |

*Co.,* 548 F.Supp. at 1077–78, *vacated on other grounds,* 719 F.2d 42 (2d Cir.1983); Note, 71 Harvard L.Rev. 564 (1958). Therefore, the public interest is not implicated by this preliminary injunction.

## VI

For the reasons set forth above, the order of the district court granting a preliminary injunction will be affirmed.